**Robert E. RICE, Plaintiff,**

v.

**FOX BROADCASTING COMPANY, et al., Defendants.**

**No. CV 99–10016 ABC (Ex).**

United States District Court,
C.D. California.

June 25, 2001.

ORDER RE: DEFENDANTS' MO-
TIONS FOR SUMMARY ADJUDI-
CATION OF CLAIMS PURSUANT
TO FED R. CIV. PRO 56

COLLINS, District Judge.

Trying to protect what he claims is his exclusive right to make or present videos or television specials in which the secrets behind well-known magic tricks or illusions are revealed, Plaintiff has sued everyone associated with making and presenting a series of allegedly infringing television specials. Most of the remaining Defendants have now filed two summary judgment motions: (1) for Summary Adjudication Re: Plaintiff's Copyright Claims ("Copyright Motion"); and (2) for Summary Adjudication Re: Plaintiff's Lanham Act/California Business & Professions Code Section 17200 Claims ("Trademark/False Advertising Motion"). Both motions came on regularly for a hearing before this Court on June 18, 2001. For the reasons indicated below, the Court GRANTS the Copyright Motion, and GRANTS IN PART the Trademark/False Advertising Motion. The Court DISMISSES the First Claim for Relief.

## I. PROCEDURAL HISTORY

On September 30, 1999, Plaintiff ROBERT E. RICE ("Plaintiff," or "Rice") filed the initial Complaint in this matter, naming a multitude of Defendants: FOX BROADCASTING COMPANY ("Fox Broadcasting Co."); FOX TELEVISION STATIONS, INC. ("Fox TV"); EARL GREENBURG PRODUCTIONS, INC. ("Greenburg Prod."); NASH ENTERTAINMENT, INC. ("Nash Entertainment"); SRJ PRODUCTIONS, INC. ("SRJ"); DLT ENTERTAINMENT LTD. ("DLT"); RIVE GAUCHE INTERNATIONAL TELEVISION ("Rive Gauche TV"); INTERNATIONAL CREATIVE MANAGEMENT, INC. ("ICM"); BRUCE NASH ("Nash"); DON WEINER ("Weiner"); EARL GREENBURG ("Greenburg"); RONALD GLAZER ("Glazer"); DAVID JOHN ("John"); MICHAEL LANCASTER ("Lancaster"); SCOTT MITCHELL ("Mitchell"); DAVID NEXT ("Next"); STEVE WOHL ("Wohl"); and LEONARD MONTANO a.k.a "Valentino" a.k.a. "The Masked Magician" ("Montano").

The Complaint asserts a claim of infringement under the Copyright Act (17 U.S.C. § 101 *et seq.*) against all Defendants (First Claim for Relief), a claim of false designation of origin/false statements under the Lanham Act (15 U.S.C. § 1125) against Defendants Fox Broadcasting Co., Fox TV, Greenburg Prod., Nash Entertainment, SRJ, Nash, Weiner, Greenburg, John, Lancaster, Mitchell, Next, and Montano (Second Claim for Relief), and a claim pursuant to the California Unfair Business Practices Act (Cal. Bus. & Prof.Code § 17200 *et seq.*) against all Defendants. *See* Complaint ¶¶ 54–71. The Complaint also includes four state-law claims which have since been dismissed (the Fourth through Seventh Claims for Relief), and

claims for unjust enrichment (Eighth Claim for Relief), constructive trust (Ninth Claim for Relief), and an accounting (Tenth Claim for Relief), against all Defendants. All the state-law claims are brought pursuant to supplemental jurisdiction due to their alleged linkage to the federal claims. *See id.* ¶¶ 2, 72–102.

On April 17, 2000, Plaintiff and Defendant DLT filed, and this Court signed, a Stipulation and Order dismissing Defendant DLT from the action. This also disposed of the Sixth (for Breach of Written Contract) and Seventh (Breach of Fiduciary Duty) Claims for Relief, which were alleged only against Defendant DLT. A second Stipulation and Order filed and signed on November 22, 2000 dismissed the First (Copyright Act) and Fourth (Breach of Confidence) Claims for Relief as to Defendants ICM and Wohl. As these were the only Defendants against whom the Fourth Claim for Relief had been alleged, this also removed this claim from the action. The Court subsequently granted a motion for summary judgment filed by Defendants ICM and Wohl as to the claims which remained against them (the Third and Fifth Claims for Relief, and by extension the Eighth, Ninth and Tenth Claims for Relief). In that the Fifth Claim for Relief was alleged only against these two Defendants, that claim was also removed by the Court's January 17, 2001 grant of the previous ICM/Wohl motion for summary judgment.

Therefore, the only substantive claims remaining are the First, Second and Third Claims for Relief.[1] Nearly all of the Defendants that remain are included on the Copyright Motion and the Trademark/False Advertising Motion, both of which were filed on April 2, 2001. The Defendants represented on these Motions

---

1. The Eighth, Ninth, and Tenth Claims for Relief also remain, but appear to be wholly dependent on the first three substantive claims.

include Fox Broadcasting Co., Fox TV, Greenburg Prod., Nash Entertainment, SRJ, Rive Gauche TV, Nash, Weiner, Greenburg, Glazer, and Montano ("Moving Defendants").[2] These Motions were originally noticed to be heard on May 14, 2001.

The Copyright Motion seeks summary adjudication of Plaintiff's copyright infringement claim (the First Claim for Relief), on several alternative grounds. The Trademark/False Advertising Motion seeks summary adjudication of Plaintiff's Lanham Act claim(s) (Second Claim for Relief) and/or Plaintiff's California Business & Professions Code Section 17200 claim (Third Claim for Relief).[3] Along with the moving papers, Moving Defendants filed a plethora of supporting materials.[4]

On April 16, 2001, Plaintiff filed his opposing papers to the two Motions (the "Copyright Opposition," and the "Trademark Opposition"). Plaintiff also submitted his own evidence in support thereof.[5] On April 30, 2001, Moving Defendants submitted their two sets of reply papers (the "Copyright Reply," and the "Trademark Reply").[6] On May 8, 2001, the Court continued the hearing on the Motions to June 18, 2001.

## II. LEGAL STANDARD ON A MOTION FOR SUMMARY JUDGMENT

The party moving for summary judgment has the initial burden of establishing that there is "no genuine issue as to any material fact and that [it] is entitled to a judgment as a matter of law." Fed. R. Civ. Pro. 56(c); see British Airways Bd. v. Boeing Co., 585 F.2d 946, 951 (9th Cir. 1978); Fremont Indemnity Co. v. California Nat'l Physician's Insurance Co., 954 F.Supp. 1399, 1402 (C.D.Cal.1997).

If the moving party has the burden of proof at trial (e.g., a plaintiff on a claim for relief, or a defendant on an affirmative defense), the moving party must make a "showing sufficient for the court to hold that no reasonable trier of fact could find other than for the moving party." Calderone v. United States, 799 F.2d 254, 259 (6th Cir.1986) (quoting from Schwarzer, Summary Judgment Under the Federal Rules: Defining Genuine Issues of Material Fact, 99 F.R.D. 465, 487–88 (1984)).

2. The only remaining Defendants not apparently represented on the instant Motions are Defendants John, Lancaster, Mitchell, and Next.

3. The two Motions were filed pursuant to a Stipulation and Order filed by the parties and signed by the Court on March 16, 2001 which, inter alia, set a briefing schedule therefor: to be filed by April 2, 2001 and opposed by April 16, 2001, with replies by April 30, 2001. The Stipulation and Order also agreed on a May 14, 2001 hearing date.

4. In addition to the separate Statements of Uncontroverted Facts and Conclusions of Law which Moving Defendants filed, pursuant to C.D. Cal. Local Rule 7.14.1, for each of these Motions ("Copyright UF" and "Trademark UF"), Moving Defendants also filed on April 2, 2001, inter alia, the Declarations of Earl Greenburg ("Greenburg Decl."), Richard Lanham, Ph.D. ("Lanham Decl."), Mark Tra-

tos ("Tratos Decl."), Donald Weiner ("Weiner Decl."), and Jeffrey Kravitz ("Kravitz Decl."). Among the exhibits to the Weiner Decl. (Exhibits A to D) are copies of the television specials produced by Defendants. Exhibit C to the Kravitz Decl. is a videotape copy of the original production by Plaintiff.

5. Plaintiff filed a separate Statement of Genuine Issues for each Opposition ("Copyright GI" and "Trademark GI"), a Request for Judicial Notice (seeking judicial notice of various exhibits), and Declarations of Robert Rice ("Rice Decl."), Judy Kauffman ("Kauffman Decl."), Larry Sackey ("Sackey Decl."), and Michael Dawson ("Dawson Decl.").

6. Along with the replies, Moving Defendants filed the Declaration of James Wynn ("Wynn Decl."), with attached deposition excerpts.

Thus, if the moving party has the burden of proof at trial, that party "must establish beyond peradventure *all* of the essential elements of the claim or defense to warrant judgment in [its] favor." *Fontenot v. Upjohn Co.,* 780 F.2d 1190, 1194 (5th Cir. 1986) (emphasis in original); *see Calderone,* 799 F.2d at 259.

If the opponent has the burden of proof at trial, the moving party has no burden to negate the opponent's claim. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The moving party does not have the burden to produce *any* evidence showing the absence of a genuine issue of material fact. *Id.* at 325, 106 S.Ct. 2548. "Instead, ... the burden on the moving party may be discharged by 'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Id.* (citations omitted).

Once the moving party satisfies this initial burden, "an adverse party may not rest upon the mere allegations or denials of the adverse party's pleadings ... [T]he adverse party's response ... *must set forth specific facts* showing that there is a genuine issue for trial." Fed. R. Civ. Pro. 56(e) (emphasis added). A "genuine issue" of material fact exists only when the non-moving party makes a sufficient showing to establish the essential elements to that party's case, and on which that party would bear the burden of proof at trial. *Celotex,* 477 U.S. at 322–23, 106 S.Ct. 2548. "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which a reasonable jury could reasonably find for plaintiff." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 252, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in favor of the nonmovant. *Id.* at 248, 106 S.Ct. 2505. However, the court must view the evidence presented "through the prism of the substantive evidentiary burden." *Id.* at 252, 106 S.Ct. 2505.

## III. FACTUAL BACKGROUND

The parties largely agree on the facts which are most material to decision on the instant Motions, though there are disputed issues of fact which are mostly collateral to the questions presented by these Motions. Thus, the following summary of the operative facts of this case, though complete enough to decide the instant Motions, does not address every fact or piece of evidence submitted by the parties. To the extent possible, the Court relies on the parties' statement(s) of the undisputed facts. Where facts are disputed, the Court so states. Where it is necessary to do so, all justifiable inferences are drawn in Plaintiff's favor, as is required on motions for summary judgment.

### A. The Mystery Magician

In 1985 and 1986, Plaintiff Rice began developing the concept and screenplay for a program called "The Mystery Magician." A screenplay was completed by April, 1986. *See* Complaint ¶¶ 24–26; Exhibit B to Complaint (April 4, 1986 "revised" version of screenplay); Copyright UF ¶ 1. Plaintiff filed an application for copyright registration in May, 1986, and a Certificate of Registration was subsequently issued. *See* Exhibit B to Complaint (Certificate of Registration: PAu 852 154). Also in 1986, Plaintiff entered into a distribution deal with CBS/Fox Video for production, manufacture, marketing and distribution of "The Mystery Magician." *See* Complaint ¶ 29; Exhibit C to Complaint. The 1986 agreement between Plaintiff and CBS/Fox Video allocated rights over the to-be-produced videotape for a term of ten years. *See id.*

A videotape was subsequently produced from Plaintiff's idea and screenplay, the

full title of which is "Mystery Magician— He Dares To Expose the Secrets Behind Magic's Most Mystifying Illusions." *See* Complaint ¶ 29; Exhibit D to Complaint. This video will hereinafter be referred to as the "Rice Video." The tape was also produced, and distribution began, during 1986. The Rice Video features a magician dressed in a black tuxedo with tails, a white tuxedo shirt, a black bow tie, and a black cape with red lining. He wears a black stocking mask/hood which covers his entire head except for his eyes. In one illusion (the Levitation illusion), the magician in the Rice Video wears white gloves, but otherwise he wears no gloves. *See* Copyright UF ¶¶ 1, 4; Copyright GI ¶¶ 1, 4. There are two voices heard on the videotape: that of the Mystery Magician, who explains the tricks in a voice-over narrative; and that of a narrator, who opens the video and announces each trick. *See* Copyright UF ¶¶ 3, 6; Copyright GI ¶¶ 3, 6.

The Mystery Magician's identity is never revealed on the Rice Video. *See* Copyright UF ¶ 8; Copyright GI ¶ 8. The parties differ on the style of presentation. Defendants insist that the Rice Video is an instructional home video which uses a pedagogical style, in which the Mystery Magician is a "careful and conscientious teacher," but in which the "ordinary" magician's "character" is otherwise not defined. *See* Copyright UF ¶¶ 2, 5, 7; Lanham Decl. ¶ 7. Plaintiff disputes this description, claiming instead that the Rice Video is a "dramatic presentation featuring a unique and novel character

...," in which the masked man "is not a teacher ... [but] a professional magician who ... is risking his career by daring to reveal ..." how various stage illusions are accomplished. *See* Copyright GI ¶¶ 2, 5. Further, Plaintiff argues his is no "ordinary magician," but a "grand master of magic" willing to reveal its greatest secrets. *See* Copyright GI ¶ 7.[7]

In performing and revealing tricks/illusions on the Rice Video, the Mystery Magician uses two male assistants also dressed in black and with black stocking type hoods, and two female assistants dressed in red, sequined one-piece bathing suits, with red masks over their eyes. *See* Copyright UF ¶ 11; Copyright GI ¶ 11. The tricks/illusions are performed and revealed in what appears to be an empty theater. During the course of the Rice Video, the Mystery Magician performs a total of twelve tricks or illusions. Of these twelve, only six are then explained/revealed. *See* Copyright UF ¶ 13; Copyright GI ¶ 13.

Plaintiff selected the twelve tricks/illusions for inclusion in the Rice Video by picking those that were fifty or more years old, yet still popular with fans. *See* Copyright UF ¶ 14; Copyright GI ¶ 14. The twelve tricks/illusions, in their order of presentation, are as follows:[8] (1) Flaming Wand/Torch (not revealed); (2) Bird in Casserole (not revealed); (3) Crystal Box (not revealed); (4) Folding Screen (not revealed); (5) Woman Sawed in Half (**revealed**); (6) Linking Rings (revealed); (7) Sword Suspension (**revealed**); (8) Three Cube Box/Zig Zag Lady (**revealed**); (9) Cards and Coins (**revealed**); (10) Ciga-

---

**7.** These "disputes," as is true of many of the alleged "disputes" of fact identified in the parties' separate statements and elsewhere, are really conclusions drawn from their own observations, and are not themselves disputed "facts." The Court notes these rival descriptions more as an example of the parties' varying arguments and their bases, than as a

legitimate example of a remaining material issue of fact.

**8.** There is some discrepancy in references to/ names for the twelve tricks performed on the Rice Video. The Court does not intend, by its adoption of the names used here, to indicate any "proper names."

rette through Coin (not revealed); (11) Lady into Tiger (**revealed**); and (12) Levitation (not revealed). *See* Copyright UF ¶ 12; Copyright GI ¶ 12. The Mystery Magician closes the Rice Video with a speech reminding his (younger) viewers not to stop believing in magic, but to be inspired: he has just revealed "tricks"; "magic" is in the skill of a magician.

Following its production in 1986, the Rice Video was sold over the next ten years by CBS/Fox Video, primarily through retail outlets (or via the Internet). *See* Copyright UF ¶ 9; Copyright GI ¶ 9. The CBS/Fox Video deal for exclusive home video rights expired in 1996, at which time Plaintiff entered a distribution deal with MPI Home Video (in November 1996) to distribute the Rice Video domestically, and a subsequent deal with DLT Entertainment (in April 1997) to distribute the Rice Video to the international market. *See* Copyright GI ¶ 9. As of December 31, 1999, approximately 17,100 units of the Rice Video had been sold by retailers, a combined total of sales during the CBS/Fox Video deal, and thereafter. *See* Copyright UF ¶ 10; Copyright GI ¶ 10.

In September, 1986, the Rice Video was featured in a segment on *Entertainment Tonight*.[9] Brief segments from the Rice Video (e.g., a few seconds of the Woman Sawed in Half trick, of the Lady into Tiger trick, of the Linking Rings trick, and of the Sword Suspension trick are each played) are layered with comments from a field reporter and a couple of brief interview segments with the Mystery Magician (masked), in which the Mystery Magician says, *inter alia*, that his goal for the Rice Video was to inspire younger magicians. *See* Exhibit 1 to Sackey Decl. ("*Entertainment Tonight* Segment"); Sackey Decl. ¶ 1. In answer to a question from the interviewer, the Mystery Magician says that he may reveal his identity someday, "but now is not the time because it is so young, because there are people in the community that are pretty angry." *See id.* Aside from this brief treatment (the entire segment on *Entertainment Tonight* lasts a maximum of three minutes), the Rice Video was never broadcast on television, or made available other than through video retailers. *See* Copyright UF ¶ 15; Copyright GI ¶ 15.

## B. The Television Specials

Many years later, sometime between 1995 and 1997, Fox television began developing an idea about doing a special or a series of specials about revealing the secrets of tricks/illusions.[10] The executive in charge of the idea for Fox was Mike Darnell. *See* Copyright UF ¶ 16.

It appears that by September or October, 1997, production began on four Fox television specials, the first of which aired on or about November 24, 1997. *See* Complaint ¶¶ 43–45; Copyright Motion at 3 n. 2; *see also* Exhibits A to C to Tratos Decl. (contracts relating to the appearance of the Masked Magician in these specials, dated September through October, 1997).[11]

---

9. Plaintiff's Complaint actually lists the *Entertainment Tonight* air date as being in November, 1986. *See* Complaint ¶ 34. However, in his more recent submission in opposing the Motions, Plaintiff lists it as September 26, 1986. *See* Sackey Decl. ¶ 1; Exhibit 1 to Sackey Decl.

10. There are substantial disputes about who actually came up with the idea for the Television Specials, and when they did so. These are addressed in Part III.C, *infra*. For the moment, however, the Court is simply giving a general summary of the genesis of these programs.

11. The parties apparently agree that the first special aired in November, 1997, though neither side has pointed the Court to testimony or other evidence in support of this allegation in the Complaint. Nor has either side pointed to any evidence to support or contradict

The four specials are titled "Breaking the Magician's Code: Magic's Biggest Secrets Finally Revealed I" ("TV Special 1"), "Breaking the Magician's Code: Magic's Biggest Secrets Finally Revealed II" ("TV Special 2"), "Breaking the Magician's Code: Magic's Biggest Secrets Finally Revealed III" ("TV Special 3"), and "Breaking the Magician's Code: Magic's Biggest Secrets Finally Revealed IV" ("TV Special 4") (collectively, "Television Specials").

The Television Specials were created for broadcast to a network television audience. *See* Trademark UF ¶ 28; Trademark GI ¶ 28. In each of the Television Specials, unlike in the Rice Video, *all* of the tricks/illusions which are performed are subsequently revealed. *See* Trademark UF ¶ 25; Trademark GI ¶ 25. Only TV Special 1 has any of the same tricks/illusions as are in the Rice Video. The three other Specials have no tricks/illusions in common with the Rice Video. *See* Trademark UF ¶¶ 23, 26; Trademark GI ¶¶ 23, 26 In TV Special 1, a total of eleven tricks/illusions are performed and revealed. Of these eleven, five are *performed* in the Rice Video, and four are *revealed* in the Rice Video. *See* Trademark UF ¶¶ 22–24; Trademark GI ¶¶ 22–24.

The eleven tricks/illusions in TV Special 1 are performed in the following order (**boldface** indicates commonality with the Rice Video): (1) **Lady into Tiger**; (2) Chinese Lantern; (3) **Levitation** (in the Rice Video, but *not* revealed); (4) Exploding Box; (5) **Three Cube Box/Zig Zag Lady**; (6) Linking Rings; (7) Metamorphosis; (8) **Woman Sawed in Half**; (9) Pull Rabbit Out of Hat; (10) Swords in the Basket; and (11) Disappearing Elephant. *See* Trademark UF ¶ 22; Trademark GI ¶ 22. As Moving Defendants point out, there are therefore more tricks/illusions that are performed and revealed in TV

Special 1(six) which are *not* in the Rice Video than there are tricks/illusions in *common* (five). *See* Trademark UF ¶ 27; Trademark GI ¶ 27. A total of twenty-eight more tricks/illusions are performed and then revealed in TV Specials 2, 3 and 4 (the specific tricks/illusions are not important here). *See also* Exhibits A to D to Weiner Decl. (TV Specials 1, 2, 3, and 4).

The magician (the "Masked Magician") in the Television Specials wears black pants, a sleek black turtleneck, a black jacket and black gloves. *See* Trademark UF ¶ 31; Trademark GI ¶ 31. He also wears a mask/hood which covers his entire head, though it appears to be made of a more rubberized/molded material than that of the magician in the Rice Video. The guise worn by the Masked Magician in the Television Specials is more of a "mask" than that worn by the Mystery Magician in the Rice Video: it has facial features such as a molded nose, eyebrows and fully-formed eyeholes, and a mouth (whereas the Mystery Magician's mask/hood simply had cut-outs for his eyes). The Masked Magician's mask is also covered with white tiger-like stripes which run up to the top of his head, sideways to his cheeks, and down onto his chin (and continuing onto his neck). *See* Trademark UF ¶ 31; Trademark GI ¶ 31. The mask of the Masked Magician actually seems more white than black.

The Masked Magician does not speak or purport to speak through a voice-over during the Television Specials (until the conclusion of TV Special 4, see below). *See* Trademark UF ¶ 33; Trademark GI ¶ 33. In contrast to the Rice Video, where the Mystery Magician (in voice-over) explains the performance of the tricks/illusions revealed, the Masked Magician performs and reveals the tricks/illusions without speak-

---

the allegations that the three subsequent specials first aired on March 3, 1998, May 5, 1998, and October 29, 1998. *See* Complaint ¶¶ 48–50.

ing. All commentary in the Television Specials is provided by the announcer (actor Mitch Pileggi), who appears on-screen at the beginning (and at the conclusion of each commercial break) of the Television Specials. He introduces himself to viewers, and his is the only voice that is heard during the performance and subsequent revelation of the tricks/illusions performed by the Masked Magician. *See* Trademark UF ¶ 34; Trademark GI ¶ 34. It is Pileggi who explains the tricks/illusions, whereas the Mystery Magician does the explaining in the Rice Video.

The Television Specials feature somewhat higher production values than the Rice Video, though the narrator (Pileggi) explicitly states at the opening of TV Special 1 that: "It doesn't matter where you see these illusions performed, in a glittery Vegas show, a big budget television special *or a show like this, where we stripped away the lasers and pyrotechnics . . .*" *See* Trademark UF ¶¶ 29–30; Trademark GI ¶¶ 29–30; Exhibit A to Weiner Decl. (TV Special 1). The "scene" for the filming of the four Television Specials is purported to be the interior of an abandoned warehouse. The stage is somewhat larger, as are the effects, than in the Rice Video. The music and mood is a bit more lively, and the tricks are performed and revealed

more quickly. The Masked Magician is assisted in the Television Specials by female dancers whose identities are not concealed. They move in a series of choreographed sequences. *See* Trademark UF ¶ 35; Trademark GI ¶ 35.

Again, the parties dispute the presentation style of the Masked Magician and/or the Television Specials. Moving Defendants and their expert claim that, by contrast to the Rice Video's pedagogical style, the Masked Magician uses a "flamboyant style of performance suited to the bigger illusions, the bigger stage, the dynamic choreography and the higher production value of the Television Specials." Trademark UF ¶ 30; *see* Lanham Decl. ¶ 7.e. Plaintiff, of course, disputes that this distinguishes the two presentations (i.e., he argues the same is allegedly true of the Mystery Magician). *See* Trademark GI ¶ 30.

The parties, and their competing experts,[12] also make a few other comparisons between the Rice Video and the Television Specials. For instance, Moving Defendants point out that even those tricks in TV Special 1 which also appear in the Rice Video (five, four revealed) are shown in different order. *See* Copyright UF ¶ 24. They also note the differing music, scene, and camera angles. *See id.* ¶¶ 45–47.

**12.** Plaintiff relies on the testimony of Judy E. Kauffman, alleged expert in the field of "Television and Motion Picture development and production." Exhibit A to Kauffman Decl. ("Kauffman Report") at 1. Kauffman focuses primarily on the "fictional principal character" of the Mystery Magician, and purported similarities with the "fictional principal character" of the Masked Magician, in support of her finding that the two works are substantially similar. *See* Kauffman Report at 8–14. To a lesser extent, she focuses on alleged dialogue similarity, particularly to the extent that these illuminate these "characters," and on similarities in "plot." *See id.* at 14–20. Moving Defendants rely on a competing opinion from Richard A. Lanham, Ph.D., Professor Emeritus of English at the University of California, Los Angeles, who is apparently an alleged expert on "close textual analysis and [the] relationship between literary texts." *See* Lanham Decl. ¶ 1; *see also* Exhibit 1 to Lanham Decl. ("Lanham Report"). Lanham's report closes by concluding that nobody can own the idea of explaining magic tricks, or of explaining them on television, that nobody can own the tricks themselves, the idea of using costumes/masks or theatrical machinery to perform or explain them, that nobody can own the literary motif of "the magicians' code," and that nobody can own the idea of warning apprentice magicians about dangerous tricks. *See* Lanham Report at 22.

Moving Defendants further emphasize that three of those tricks which appear in both videos are performed (and explained) differently by the respective magicians. In the Lady into Tiger trick/illusion in the Rice Video, a female assistant climbs from the cage into a hollow in the stairs leading up to the cage, which are then pushed away by the Mystery Magician. The cage remains on the ground while being spun around by the Mystery Magician's male assistants, until it is finally uncovered to reveal a tiger (initially hidden by a false back wall of the cage). By contrast, in the Lady into Tiger trick/illusion in TV Special 1, the female assistant instead climbs into a false bottom in the cage, and remains therein as the cage is lifted into the air and spun around on its cable(s). She pulls the cable which releases the false back of the cage, allowing the tiger inside. *See id.* ¶ 49.

Similarly minor differences may be seen in two of the other four tricks appearing in both videos. In the Linking Rings trick/illusion in the Rice Video, the Mystery Magician uses three rings, and then eight rings (each time illustrating the use of a "key ring" which has a break through which other rings may be passed by sleight of hand). In TV Special 1, however, although the Masked Magician similarly uses three rings, and the use of the non-solid ring is also revealed, the Masked Magician does not move on to show use of eight rings. In the Woman Sawed in Half trick/illusion in the Rice Video, the assistant's head and feet are visible, and the Mystery Magician uses false feet and a false leg to fool the audience. In TV Special 1, by contrast, the woman is first placed in shackles/stocks, and a box is lowered over her body so that only her (bound) hands extend. The illusion does not use false feet or a false leg (the "trick" is that her legs *appear* to be restrained, but really are not). *See id.* ¶¶ 50–51.

Finally, Moving Defendants point out that Plaintiff admitted in his deposition that there are differences in the dialogue/voice-overs in the Rice Video and in TV Special 1. *See id.* ¶ 52; Deposition of Robert Rice ("Rice Depo.") at 300.[13] Moving Defendants also disclaim any identity of language between the opening monologues/comments of the Rice Video and TV Special 1, or the closing speeches of the Rice Video and TV Special 4. *See id.* ¶ 53. The scene in TV Special 4 to which Moving Defendants refer is the final scene in the last of these four specials, in which the Masked Magician takes off his mask and reveals himself to be a magician named "Valentino." *See* TV Special 4.

Plaintiff, in response, relies primarily on the opinion of his expert witness (Kauffman), and points to alleged similarities between the "character" of the Mystery Magician and the "character" of the Masked Magician, as well as purported similarities in "plot, setting, sequence of events, dialogue (or monologue), mood, tone and pace [all of which are] directly driven from the persona of the Masked Magician ... a magician anti-hero who embarks upon a simple, direct approach to the age-old 'no-no' of telling tales out of school by revealing highly secret magic illusions to the public." Copyright Opposition at 14–15. Pointing to similarities in costume, social standing, and the respective roles of the two men in the two presentations, Plaintiff argues an identity of "character." He also points to similarities in setting (empty theater vs. abandoned warehouse), and to the fact that both men faced anger from the "magic community." *See id.* at 16–17.

---

**13.** Excerpts from the Rice Depo. appear as exhibits to several of the supporting documents. *See, e.g.,* Exhibit B to Kravitz Decl.

These are really Plaintiff's (expert's) *opinions,* rather than *facts.*

The primary *factual* similarities to which Plaintiff points, in addition to those already noted above, are the alleged similarities (though not identity) between the opening and closing monologues of the Rice Video and of TV Special 1 and TV Special 4. Plaintiff does not (and cannot) claim that the actual words/scripts are identical, but he seems to emphasize the similarity in *themes* revealed by the opening and closing speeches in the two presentations. For example, Plaintiff notes that both opening monologues state, with different words, that the respective magicians will be placing their careers at risk (and perhaps inviting some *physical* consequences) by what they are about to reveal to the audience, so that in each the (Mystery or Masked) magician's identity must be concealed. *See id.* at 18.

Plaintiff also notes that, as is true of the Mystery Magician's closing monologue in the Rice Video, the Masked Magician, when he is revealed at the close of TV Special 4, gives a similar speech (again, in different words) about how the secret of the trick is only a small part of magic, and the real magic is in the performance. The Masked Magician/Valentino also similarly reveals his true "altruistic" motive for revealing illusions: to inspire "bigger and better tricks." *Id.*[14] In addition to their alleged similarities in theme, if not in words, Plaintiff claims these speeches illustrate similarity of "character."

Finally, Plaintiff points to other claimed similarities. For instance, Plaintiff notes that both narrators state that the audience is about to see heretofore-secret stage illusions performed, and that all of the various illusions are performed without trick photography or other special effects. Plaintiff also claims that the opening of the Rice Video, in which a man's (presumably the Mystery Magician's) feet are shown walking into the frame, and then walking down a dark and deserted street, is strikingly similar to the opening of at least TV Special 1, in which the host, Mitch Pileggi, strides into the frame in front of an apparently abandoned warehouse. *See id.* at 20–21.

As far as distribution and sales, the parties agree that videos of the four Television Specials, unlike the Rice Video, have not been generally available for purchase in video stores or retail outlets. *See* Trademark UF ¶ 38; Greenburg Decl. ¶ 3. Rather, it appears that videotape versions of the Television Specials were primarily sold in conjunction with their broadcast on television. *See* Trademark UF ¶ 36; Trademark GI ¶ 36; Greenburg Decl. ¶ 2. Television viewers were invited to order videotapes of the show they had just seen by calling a telephone number which appeared on the screen at the conclusion of the broadcast(s). *See* Trademark UF ¶ 37; Greenburg Decl. ¶ 2. It does appear, however, that perhaps the Television Specials were later re-packaged for direct sales to the public via the Fox.Com website, and/or through other Internet retailers. *See* Trademark GI ¶¶ 36–37; Sackey Decl. ¶¶ 43, 44, 46; Exhibits 43, 44, and 46 to Sackey Decl. No sales or profit figures are

---

**14.** For *this* alleged "similarity" (his own "altruistic" motive), Plaintiff actually relies not on the closing speech in the Rice Video itself, but on his statement to the interviewer on the *Entertainment Tonight* segment which was filmed after its release. *See id.* Apart from a general statement from the Mystery Magician not to let what he reveals be the end of his viewers' belief in magic, but a "beginning of your appreciation for magic and great magicians," the Rice Video actually has no statement of "altruistic" motive. *See* Rice Video. It does, however, similarly state that the Mystery Magician can only give away the trick, not the *magic,* which is in the magician's performance.

provided for either the original sales in connection with the broadcast or the Television Specials, or for these purported direct sales over the Internet. Nor is any ratings information provided for the broadcast(s) of the Television Specials.

## C. Genesis and Development of the Television Specials

The parties heavily dispute facts pertaining to the origin(s) of the idea for the Television Specials, and/or the inferences that may be drawn therefrom as to Defendants' access to the Rice Video and the likelihood that the Television Specials are derivative thereof. They each tell a fairly mutually-exclusive story about how the Television Specials came to be, and about the inspiration for these programs.

Moving Defendants, for instance, insist it was Mike Darnell at Fox who first "proposed" the specific idea for what eventually became the Television Specials. *See* Copyright UF ¶ 16; Deposition of Mike Harris Darnell ("Darnell Depo.") at 46–50; Deposition of Bruce Nash ("Nash Depo.") at 60, 67.[15] Though apparently unwilling or unable to be very precise about the specific date, they contend that there was a meeting sometime between 1995 and early 1997 between Bruce Nash (who seems to be a producer), Steven Wohl (Nash's agent at ICM), and Mike Darnell. *See id.* In that meeting, which was a "pitch meeting" to discuss various ideas for television specials/shows, Moving Defendants claim that it was Darnell who first came up with the idea of doing a show where the secrets of magic tricks would be revealed. This is

supported by testimony from Darnell and Nash, each of whom stated in deposition that it was Darnell who had this idea first. *See id.* The purported inspiration for Darnell's idea was in part a recent visit that Darnell had allegedly made to the Magic Castle, a club/venue for professional magicians and their guests, where he was confounded by a trick he saw performed. *See* Copyright UF ¶ 17; Darnell Depo. at 47.

Darnell's recollection of the meeting is that Nash and Wohl were actually reluctant, at first, to get involved in such a project, for fear of anger from other magicians. *See* Darnell Depo. at 50. Darnell claims that he eventually convinced them of the merits of the idea, in part by suggesting that they could disguise the magician in the show so that he would not have to worry about anger or retribution from the "magic community." *See* Copyright UF ¶ 18; Darnell Depo. at 51–52. In their depositions, both Darnell and Nash specifically state that it was Darnell (not Nash or Wohl) who first had the idea for the show(s), and of disguising the magician therein. *See* Darnell Depo. at 52; Nash Depo. at 59–67. This is confirmed by deposition testimony from Wohl in which he states that prior to the meeting (in 1995, 1996, or 1997) he and Nash had with Darnell, Nash had never had, suggested, or passed on to him the idea of doing a show about revealing magic tricks. *See* Exhibit K to Dawson Decl. ("Wohl Depo.") at 31–32.[16] Darnell further reports that it was his idea to give the Television Specials a

---

**15.** Again, portions of these depositions are reproduced as various exhibits. Here, the Court relies on Exhibits D and F to Kravitz Decl.

**16.** Curiously, Plaintiff points to this Wohl testimony as somehow serving to "further cloud the issue of how this idea was allegedly conceived ..." Copyright GI ¶ 16. Plaintiff

claims that Wohl's testimony is contrary to the inference to be drawn from various pieces of correspondence Wohl received/passed on from Nash (see below). *See id.* Thus, rather than "confirming" Nash and Darnell's version of the genesis of the Television Specials, it appears that Plaintiff argues that Wohl's testimony only "confirms" that all three are really lying.

bit of a "sarcastic"/in-on-the-joke edge. *See* Darnell Depo. at 61–62.

Following this meeting, it appears that development/production on the Television Specials soon got into gear. By September, 1997, it appears that Nash Entertainment had entered into negotiations with Montano a.k.a. "Valentino" to play the Masked Magician. *See* Copyright UF ¶ 19; Tratos Decl. ¶¶ 7–8; *see also* Exhibits A to C to Tratos Decl.

Moving Defendants insist (and Plaintiff admits) it was actually Montano/Valentino, or more specifically his attorney (Tratos), who insisted that Montano/Valentino appear in a mask and costume. This was expressly included in the contract Montano/Valentino signed with Nash Entertainment, at Tratos' insistence. *See* Copyright UF ¶ 19; Tratos Decl. ¶¶ 7–8. The reason for this, Tratos states, is that he wanted to ensure that his client, who had previously been a successful professional magician in Las Vegas, would not suffer career damage. *See* Tratos Decl. ¶¶ 4–8. Plaintiff notes that Montano/Valentino has stated that he never intended to keep his identity a secret forever. *See* Copyright GI ¶ 19; Sackey Decl. ¶ 22; Exhibit 22 to Sackey Decl. At some point, Weiner and Montano/Valentino decided to make it a "very glitzy Vegas type of a show." Exhibit G to Kravitz Decl. ("Valentino Depo.") at 86. The tricks in TV Special 1 were allegedly chosen in an informal poll of Fox employees. *See id.* at 80; Copyright UF ¶ 29.

Moving Defendants claim there is no evidence that, prior to the commencement of this lawsuit, any of the Defendants involved in the development or production of

the Television Specials had either seen or heard of the Rice Video. *See* Copyright UF ¶ 21. Indeed, in each of their depositions, Montano/Valentino, Weiner, Nash, Darnell, and Fleiss (co-writer with Nash of the Television Specials, under the name David Next) denied having seen the Rice Video. *See* Valentino Depo. at 135; Exhibit E to Kravitz Decl. ("Weiner Depo.") at 52; Nash Depo. at 31–32; Darnell Depo. at 32–34; Exhibit I to Kravitz Decl. ("Fleiss Depo.") at 80. Further, there is no dispute that prior to production, Nash Entertainment did trademark searches for federal/state trademark registrations in entertainment-related classes for similar marks, and found no references. *See* Trademark UF ¶ 21; Trademark GI ¶ 21.

In contrast to this version of events, Plaintiff claims that the Defendants primarily responsible for the development of the Television Specials had a significant number of opportunities to, and probably did, know about and view the Rice Video at various times prior to the production of the Television Specials. Plaintiff therefore implies that they got their idea from his own video, and/or copied therefrom.

First of all, Plaintiff claims that the "most direct route" for Defendants to have had either "actual knowledge" of the Rice Video or an "opportunity to view or copy it" was through his own submission, in March of 1996, of copies of the Rice Video and a "pitch" sheet to Mike Darnell at Fox. Copyright GI ¶ 21.[17] This is obviously contradicted by Darnell's testimony that he had never seen nor heard of the Rice Video. *See* Darnell Depo. at 32–34. Plaintiff admitted in deposition that he has

---

**17.** In his own deposition testimony, Plaintiff actually testified: "I had sent him a—I *think* I sent him two videos and a pitch sheet that we ought to be doing this thing, and we ought to produce this and reproduce it, if you will, and show it on Fox TV as a special." Rice Depo. at 90–91 (emphasis added). Moving Defen-

dants deem this apparent equivocation fairly significant, implying that Plaintiff's ostensible lack of assurance about having sent the tapes and pitch sheet should lead the Court to assume he never did so. *See* Copyright Motion at 8.

no copy of the "pitch" sheet purportedly sent to Darnell. He also stated that he received no response to this alleged pitch. *See* Rice Depo. at 92–94. Nonetheless, Plaintiff continues to maintain that Darnell had the Rice Video in hand at least by March of 1996.

Plaintiff also engages in a somewhat complicated combination of inferences and assumptions designed to establish a "chain" or "chains" of custody of the Rice Video itself and/or of idea(s) therein. These purportedly culminate in the possession, by Defendants privy to the production of the Television Specials, of one or both "properties."

For instance, one thread of Plaintiff's inferential chain begins with Stephen Marks, a talent agent with ICM who represented Plaintiff in his 1986 negotiations with CBS/Fox Video for production and then distribution of the Rice Video.[18] Marks was Plaintiff's agent from 1986 until 1988, when Plaintiff's contract with ICM ended. During this period of representation, Plaintiff asserts that he gave copies of the Rice Video to Marks. He also claims (despite the exclusivity of his contract with CBS/Fox Video) that following the "splash" that his video made in 1986 (e.g., the *Entertainment Tonight* segment, and an alleged boycott by members of the "magic community"),[19] Marks began shopping the Rice Video to various television networks, including Fox. *See* Rice Depo. at 40–43, 68–74, 85; Exhibit H to Kravitz Decl. ("Marks Depo.") at 16–21. The testimony supposedly supporting this alleged

submission to Fox television is very thin, if not non-existent.

Plaintiff also claims (and Marks confirms) that when Darnell gave the "green light" for the Television Specials for Fox, Marks called Darnell to protest. *See* Rice Depo. at 149–150; Marks Depo. at 35–38. In this alleged conversation, though Marks' objections seem to have been more ethical than legal, he says he likely told Darnell about the Rice Video, and the reaction of the magic community thereto. *See id.*

The "thread" which begins with Marks also involves Defendant Wohl (dismissed from the case in the January 17, 2001 Prior Order). It seems that during the 1986–1988 time period during which Plaintiff was represented by Marks at ICM, Wohl (another ICM talent agent) had the office down the hall from Marks. *See* Marks Depo. at 19. Plaintiff claims that on a number of occasions on his way to and from his visits with his agent, Marks, he would stop and chat with Wohl. He asserts that during pre-production of the Rice Video, Wohl repeatedly told him he "loved" the idea, and that (apparently after seeing a completed version thereof), Wohl told Plaintiff that he thought it would be a "smash hit." Rice Depo. at 213–214. Plaintiff points out that ICM, and Wohl, subsequently became the agent(s) for Defendant Nash, around 1989 or 1990. *See* Copyright Opposition at 7; Nash Depo. at 18–19.

Plaintiff clearly implies that Wohl may have "passed" the idea (or even the actual

---

**18.** Some of these details are also discussed in the Court's prior order, filed January 17, 2001, granting summary judgment to Defendants ICM and Wohl. *See* Exhibit M to Kravitz Decl. ("Prior Order") at 5–10.

**19.** Plaintiff claims, *inter alia*, that Johnny Carson, at that time still host of *The Tonight Show*, publicly denounced the Rice Video as a threat to magic. *See* Copyright Motion at 2;

Copyright Opposition at 10; Exhibit L to Kravitz Decl.; Rice Depo. at 177–178, 255. He also notes that *Inside Magic*, a "leading trade publication for [the] magic community reported on the controversy ... for four straight months." Copyright Opposition at 10; Sackey Decl. ¶¶ 7–10; Exhibits 7 to 10 to Sackey Decl. (issues dated 9/1/96, 10/1/86, 11/1/86, and 12/1/86).

videotape) of the Rice Video on to the Defendants involved in the Television Specials, either directly (through Wohl's participation in the 1995–97 meeting with Darnell) or indirectly (by giving the idea and/or the videotape to Defendant Nash). There is no direct evidence of this "chain" of custody. However, in what might be considered the same "thread" or, alternatively, a different "thread," Plaintiff next focuses on Defendant Nash's purported involvement in developing a television show about revealing magic tricks, long before the idea was allegedly "proposed," in the "pitch meeting," by Darnell.

Specifically, Plaintiff points to documents obtained from Nash (and Nash Entertainment) in discovery, which seem to be, essentially, lists of project ideas Nash was pursuing at various times. The first of these is an October, 1990 memorandum from a production company with which Nash was apparently associated. *See* Exhibit 29 to Sackey Decl.

The 1990 memorandum (which was not apparently written by Nash) relates to a (proposed) television program called "America's Best Kept Secrets," which was to contain a five-minute segment called "Secrets of Magic." The synopsis of this segment states: "In this segment we will show how a woman is sawed in two. We will perform the trick once straight and then re-run the trick revealing the secret." *Id.* The memorandum discusses magicians who might possibly be appropriate to star in the revealing-magic segment, including "Harry Blackstone." The memorandum says that Blackstone was initially leery of giving away any secrets, and "would only do it if he can do a twist on the trick." *Id.* The responses from other magicians are also listed. *See id.*

Other documents to which Plaintiff points include a January 27, 1997 memorandum from Nash Entertainment to his agent(s) at ICM, in which are laid out the "Business Objectives" for Nash Entertainment for the year 1997. *See* Exhibit 30 to Sackey Decl. This is basically a list of projects being pushed by Nash Entertainment, and includes under "ACTION NEEDED:" for the category "PRIME-TIME SPECIALS" that he would like to "[g]et Mike Darnell to pick up the five projects he likes," among which is included "Magic Secrets Revealed." *Id.* This 1997 objective was apparently not immediately achieved, as on April 24, 1997 Nash wrote a letter to Darnell (with a copy to Wohl) laying out a "list of new TV projects *for your consideration.*" Exhibit 31 to Sackey Decl. (emphasis added). Among the described projects was one entitled "MAGIC TRICKS REVEALED!" along with the following text: "Ever wonder how all those magic tricks you see on TV are actually pulled off? For the first time on network television, this amazing special reveals how!" *Id.* Plaintiff claims that these documents indicate that Nash (and/or Wohl) were actually pitching this idea *to* Darnell.

Plaintiff also asserts that it is most likely that the so-called "pitch meeting" between Darnell, Nash, and Wohl actually took place on June 2, 1997. He bases this on a letter from Nash to Darnell (and Wohl), dated June 3, 1997, in which Nash says: "I really enjoyed our meeting yesterday. I'm thrilled to be producing ... WORLD'S GREATEST MAGIC TRICKS REVEALED! ... for FOX." Exhibit 33 to Sackey Decl. He goes on to assert, based on certain equivocal testimony from Darnell, that it was most likely actually Nash (and/or Wohl) who "proposed" the idea which eventually became the Television Specials. He notes that Darnell said that "[t]he concept came out of" that "pitch meeting," and that Darnell testified that it was Nash and Wohl who were "doing the pitching." Darnell Depo. at 45–47. Plaintiff claims that both Darnell's (and Nash's and Wohl's) claim that it was Darnell who came up with the idea, and the agreement

of these three that Nash and Wohl were hesitant and fearful to become involved, are belied by the 1997 (and 1990) correspondence which allegedly predated the meeting.[20]

It is also apparently undisputed that in 1993 or 1994, Nash (and Fleiss, his writing partner on the Television Specials) participated in a television production called "Secrets Revealed," which was first aired on ABC, and later on The Learning Channel. *See* Nash Depo. at 14–16. This show was about revealing all kinds of secrets, but did have one segment consisting of exposing the Woman Sawed in Half trick.

It is not clear exactly how large a role Nash (or Fleiss) played in developing, writing, or producing the "Secrets Revealed" show, or the specific segment on the Woman Sawed in Half trick, but the show does bear a striking resemblance to the proposed special laid out in the 1990 memorandum (on Ohlmeyer Communications Company letterhead) with which Nash has been associated. The "Secrets Revealed" show was hosted by actor William Devane, who provides much of the introduction and commentary on each of the respective segments (e.g., the show has another segment revealing the secrets of beauty pageant contestants). The Woman Sawed in Half segment is introduced with a lot of rhetoric about the secrecy maintained by magicians, and the ethical codes by which they are bound to refrain from revealing their secrets. Then Devane says that, "for the first time on network television," one of those famous illusions will be exposed: the Woman Sawed in Half.

The trick is first performed by a magician named Chris Angel, who is described as being a young magician "on the cutting edge" of magic, whose shows are like a cross between a rock concert and a magic show. Angel and his two female assistants are not masked, and there is loud music playing throughout his performance of the trick. Aside from the fact that he uses a chain saw to "cut" one of the assistants in half inside the box, however, the trick is performed nearly identically to how it is performed in the Rice Video. Following the performance of the trick, there is an interview with Harry Blackstone, described as being the son of one of the all-time masters of magic. Blackstone describes the ethical canons of magic, and how magicians cannot and should not reveal their secrets. He implies they might face some sort of discipline for violating ethical canons from either international or American societies of magicians. *See* Exhibit 2 to Sackey Decl.

Blackstone says that he *could* tell how the Woman Sawed in Half trick is done, but that he refuses to do so. He says that secrecy is very important, and that ethics committee(s) have come up with lists of rules that magicians are supposed to follow. Blackstone makes a reference to "a magician several years ago" who "divulged one of the secrets in a blindfold—not a blindfold but a mask, rather, on his face, in order to hide his identity." Blackstone says that "we, of course, knew who it was, and that magician, or rather his widow, now are suffering the results of it." *Id.*[21]

---

**20.** Of course, Plaintiff's version of events is somewhat dependent on his conclusion that the "pitch meeting" described by Darnell, Nash, and Wohl is the same meeting to which Nash refers in his June 3, 1997 letter. In other words, if the "pitch meeting" took place *before* the 1997 letters which Plaintiff claims show Nash's prior development of the idea for the Television Specials (e.g., sometime in 1995 or 1996), then Plaintiff has only the somewhat ambiguous 1990 memorandum, which was not apparently prepared by Nash, to suggest his prior "invention."

**21.** Plaintiff clearly believes that this reference should be read to refer to the Rice Video, and

The host of the show notes that the producers actually had to "leave the country" to find any magician willing to reveal the Woman Sawed in Half trick. Named only as "Mr. X," an on-screen interview is conducted with a magician clad entirely in black, who wears fencing headgear to hide his face, and whose voice is altered to "protect his identity." He says that many in his profession would "take a shot at me for doing this." *Id.*

Mr. X, and his masked assistants, are next shown re-creating the trick as performed by Angel, though substituting a sword for the chain saw used to "cut" the assistant in half. The methodology of the trick is nearly identical to that employed in the Rice Video, including the fake legs and feet, but with slightly higher production values (e.g., the fake legs and feet are actually able to "move" thanks to an off-stage assistant with a remote control). The narrator's voice takes the viewer quickly through all of the various stages of the trick.

Based on all of these "chains" of custody, or "threads" in the development of Nash Entertainment's involvement in the revelation of magic secrets, Plaintiff clearly believes that it was Nash, rather than Darnell, who "proposed" the idea of the Television Specials. It is less clear how exactly Plaintiff believes that Nash got *his* idea from the Rice Video. This apparently relies on Plaintiff's theory as to Wohl's direct or indirect involvement in spreading it around. In other words, it appears that Plaintiff would draw a "thread" for the copying of his idea and/or his Rice Video from Marks to Wohl (or from Plaintiff to Wohl directly) to Nash, and finally to Darnell, at Fox.

---

to the alleged backlash he endured at the hands of the "magic community." However, Blackstone's reference is far too ambiguous (and hypothetical) to draw this conclusion; at

## D. Background for Trademark/False Advertising Claims

Plaintiff admits that he has never registered "Mystery Magician," or any related mark, as a trademark or trade dress with either a state or federal agency appropriate for such registration. *See* Trademark UF ¶ 39; Trademark GI ¶ 39. Nonetheless, Plaintiff claims common law trademark rights in the name "Mystery Magician," and apparently also in the "character" in the Rice Video, based on his use of the mark (and the character) in commerce. *See* Trademark GI ¶ 39.

Plaintiff also has not commissioned a formal consumer confusion survey, to demonstrate a likelihood of confusion between his mark and any similar mark used by Defendants. *See* Trademark UF ¶ 40; Trademark GI ¶ 40. Plaintiff did claim in his deposition that he invited some friends and neighbors over to watch the Rice Video and the Television Specials, and that they all thought they were similar. *See* Rice Depo. at 203–205. He also points to one or two alleged incidents of actual confusion of the two works by distributor(s), and by a website selling the Television Specials. *See* Exhibits 23 and 39 to Sackey Decl.

As support for his claim of false advertising actionable under Section 43(a) of the Lanham Act and California Business & Professions Code Section 17200, Plaintiff points to several allegedly (literally) false statements made during the Television Specials or in connection with their promotion. First, he notes that Mitch Pileggi, on-camera narrator of the Television Specials, says in his opening monologue that the secrets of magic will be revealed "tonight, *for the first time on television* ..."

---

a minimum, his reference to the prior masked magician's "widow" would not apparently apply to describe this very-much-alive Plaintiff.

TV Special 1 (emphasis added). Plaintiff asserts that this is a literally false claim of being "first" on TV.

Second, Plaintiff points to several statements made on the video packaging of the Television Specials when TV Specials 1 and 2 were repackaged for direct sales as a single "two-volume set." *See* Exhibits 43 and 44 to Sackey Decl. The allegedly offending statements to which Plaintiff points include: "Magic's Biggest Secrets *Finally* Revealed," "*Never before* has a magician dared to reveal the dark secrets behind the world's mystifying illusions," and "You've Always Wondered How They ... Saw a woman in half, make an elephant disappear, shoot an arrow through a human body, escape from a padlocked water tank. *Now, for the first time,* you'll learn the secrets behind these and many, many more tricks and illusions." Exhibit 43 to Sackey Decl. (emphasis added). These statements appear on the back of the "Volumes I & II" videotape, in the descriptive section. Also, on the front cover of the tape are the words: "Plus: *Never Before Seen on TV!* World's Most Mystifying Illusions-*Unveiled At Last.*" *Id.* (emphasis added).

On the basis of these claimed falsities, Plaintiff asserts the right to a claim under the Lanham Act, and/or under Section 17200, for actionable false representations. These claims are separate and apart from Plaintiff's claim of trademark infringement and confusion.

## IV. DISCUSSION

Moving Defendants seek judgment as a matter of law on Plaintiff's first three Claims for Relief (which would, by extension, also seem to dispose of the final three Claims for Relief, which are really only prayers for the specific equitable remedies of disgorgement based on unjust enrichment, a constructive trust, and/or an accounting). They argue that there are no

triable issues of fact supporting Plaintiff's claims for copyright infringement (17 U.S.C. § 101 *et seq.*) (the First Claim for Relief), for trademark infringement or false statements in violation of the Lanham Act (15 U.S.C. § 1125) (the Second Claim for Relief), or violations of the California Unfair Business Practices Act (Cal. Bus. & Prof.Code § 17200 *et seq.*) (the Third Claim for Relief). The Copyright Motion addresses the First Claim for Relief, while the Trademark/False Advertising Motion addresses the Second and the Third. Plaintiff has opposed both Motions. They will be addressed in turn.

### A. The Copyright Motion: Plaintiff's First Claim for Relief

A plaintiff asserting infringement of copyright must prove: (1) ownership of a valid copyright; and (2) infringement-that defendant copied protected elements of the plaintiff's work. *See Three Boys Music Corp. v. Bolton,* 212 F.3d 477, 481 (9th Cir.2000). "Absent direct evidence of copying, proof of infringement involves fact-based showings that the defendant had 'access' to the plaintiff's work and that the two works are 'substantially similar.'" *Id.* In this case, the existence and validity of Plaintiff's copyright in the Rice Video is not contested. Therefore, the question is whether the Television Specials copy protected elements thereof. With no *direct* evidence of copying, both "access" and "substantial similarity" must be proven.

### 1. Access to Plaintiff's Work (the Rice Video)

Sufficient "access" to a copyrighted work to make it reasonably plausible that the allegedly infringing work is copied therefrom is defined as "an opportunity to view or to copy plaintiff's work." *Sid and Marty Krofft Television Productions, Inc. v. McDonald's Corp.,* 562 F.2d 1157, 1172

(9th Cir.1977). "We have defined reasonable access as 'more than a "bare possibility.'"" *Three Boys Music,* 212 F.3d at 482. Thus, there must be a "reasonable possibility" or "reasonable opportunity" for viewing the plaintiff's work. *See id.* "Access may not be inferred through mere speculation or conjecture. At times, distinguishing a 'bare' possibility from a 'reasonable' possibility will present a close question." *Id.* (quoting 4 Melville B. Nimmer & David Nimmer, *Nimmer on Copyright,* § 13.02[A], at 13–19 (1999)).

"Access" to a plaintiff's copyrighted work is most often proven through circumstantial evidence, because admissions or direct evidence of access for purposes of copying are rare. "Circumstantial evidence of reasonable access is proven in one of two ways: (1) a particular chain of events is established between the plaintiff's work and the defendant's access to that work ..., or (2) the plaintiff's work has been widely disseminated." *Id.* (citations omitted). Access can be difficult to prove, but is also difficult to disprove. As a result, reasonable access to a plaintiff's work is often conceded, at least for purposes of summary judgment. In this case, however, the Moving Defendants dispute that they had ever seen or heard of, let alone had a reasonable opportunity to view for purposes of copying, the Rice Video, prior to development/production of the Television Specials. The Court must therefore gauge Plaintiff's proof that one or more of those Defendants involved in this production had access to his work.

■ This may be one of those times where the line between a "bare" possibility and a "reasonable" possibility of access is difficult to draw. Certainly, Plaintiff has not presented overwhelming evidence that any of the Defendants involved in production were aware of, or had an opportunity to view or copy, the Rice Video. He has only his own testimony (contradicted by Darnell's) to support his claim that he sent copies of the Rice Video to Darnell in 1996. And while all the inferential evidence presented by Plaintiff, to refute Darnell's claim (supported by Nash and Wohl) that it was he who came up with the idea for the Television Specials, might be sufficient for that purpose, a far greater leap must be made to go from assuming that it was Nash who was pushing the idea to concluding that Nash got the idea from/copied the expression of the Rice Video. This leap requires a fair amount of speculation and conjecture. We must assume that: Marks or Plaintiff told Wohl about the Rice Video, and/or gave him a copy; that Wohl gave the idea and/or the tape to Nash; and that Nash shared the idea and/or the tape with Darnell. However, in his deposition Plaintiff *admitted* he had no reason to think that Wohl had given either the Rice Video or its script either to Nash or to Darnell. *See* Rice Depo. at 379–380.

Plaintiff is also not significantly helped by the fairly meager distribution of the Rice Video, which has only sold 17,100 + copies in domestic and international markets in the thirteen years from release in 1986 to the latest figures from 1999. Moreover, at least some of these sales must have taken place *after* development of the Television Specials, even if the Court *assumes* that these were not "pitched" to Darnell/Fox until 1997. And even if the full total of approximately 17,100 sales is considered, this is not exactly market saturation; it is not clear that this should be considered "widely disseminated."

Nonetheless, for purposes of summary judgment the Court construes these facts in the light most favorable to Plaintiff, the nonmovant. While Plaintiff's evidence of access is weak, it is enough to raise a triable issue of fact as to whether Darnell, Nash, or others had the opportunity to

view or copy the Rice Video. The question, after all, is not whether Defendants *actually* viewed or copied the Rice Video (a question more properly addressed by "substantial similarity"), but whether they had the "opportunity" to do so. *See Krofft*, 562 F.2d at 1172. "The trier of fact may conclude that the person who created defendant's work had, but did not avail himself of, the opportunity to view, but this conclusion properly goes to the ultimate issue of copying, and not to the subordinate issue of access." 4 Melville B. Nimmer & David Nimmer, *Nimmer on Copyright* § 13.02[A] at 13–16 (2000) [hereinafter *Nimmer*]. In this case, the combination of Plaintiff's testimony that he sent copies of the Rice Video to Darnell, and the inferential chain of custody flowing to development by Nash, are for purposes of summary judgment enough to constitute proof of access.

However, the Court rejects Plaintiff's claim that there is such *strong* proof of access that the Court should employ the "inverse ratio rule," and therefore require less "substantial similarity" between Plaintiff's work and the allegedly infringing work of the Defendants. *See* Copyright Opposition at 12. Plaintiff relies on cases noting the inextricable linkage between access and substantial similarity, which "require a lower standard of proof of substantial similarity when a high degree of access is shown." *Three Boys Music*, 212 F.3d at 485; *see also Smith v. Jackson*, 84 F.3d 1213, 1218 (9th Cir.1996); *Shaw v. Lindheim*, 919 F.2d 1353, 1361–62 (9th Cir. 1990). Plaintiff has not met this standard of showing a *"high* degree of access" by Defendants.

If anything, Plaintiff's proof of access is sufficiently weak to suggest that perhaps the opposite maxim should apply: that Plaintiff should be required to offer *greater* proof of similarity. However, the "inverse ratio rule" does not tilt in that di-

rection. "We have never held ... that the inverse ratio rule says a weak showing of access requires a stronger showing of substantial similarity. Nor are we redefining the test of substantial similarity here ..." *Three Boys Music*, 212 F.3d at 486. Accordingly, the only question is whether Plaintiff has satisfied the showing necessary to avoid judgment as a matter of law on the issue of access. The Court finds that he has. The fact that he only barely cleared that bar is of no import to the remainder of the Court's inquiry. Plaintiff's proof of access is not so strong as to *lower* the bar for "substantial similarity." Beyond that, however, the Court approaches similarity with a clean slate.

### 2. Substantial Similarity: Copying of Protected Elements

 Copyright infringement is a measure of the extent to which an allegedly infringing work represents "copying of constituent elements of the work that are original." *Feist Publications, Inc. v. Rural Telephone Service Co.*, 499 U.S. 340, 361, 111 S.Ct. 1282, 113 L.Ed.2d 358 (1991). In other words, it is only copying of *copyrightable* elements of a plaintiff's work that is answerable under the federal Copyright Act. "The mere fact that a work is copyrighted does not mean that every element of the work may be protected. Originality remains the *sine qua non* of copyright; accordingly, copyright protection may extend only to those components of a work that are original to the author." *Id.* at 348, 111 S.Ct. 1282. Thus, "[n]ot all copying ... is copyright infringement." *Id.* at 361, 111 S.Ct. 1282. Whether original expression has been copied is a case by case determination.

 Therefore, " '[s]ubstantial similarity' refers to similarity of expression, not merely similarity of ideas or concepts." *Dr. Seuss Enterprises, L.P. v. Penguin Books USA, Inc.*, 109 F.3d 1394, 1398 (9th

Cir.1997) (citing 17 U.S.C. § 102(b)). And it is only "protected expression" which is relevant for purposes of assessing "substantial similarity." *See Shaw*, 919 F.2d at 1361. "As we recognized long ago in the case of competing jeweled bee pins, similarities derived from the use of common ideas cannot be protected; otherwise, the first to come up with an idea will corner the market." *Apple Computer, Inc. v. Microsoft Corp.*, 35 F.3d 1435, 1443 (9th Cir. 1994). "[T]he party claiming infringement may place '*no* reliance upon any similarity in expression resulting from' unprotectable elements.'" *Id.* (quoting, and adding emphasis to, *Aliotti v. R. Dakin & Co.*, 831 F.2d 898, 901 (9th Cir.1987)). "[T]he unprotectable elements have to be identified, or filtered, before the works can be considered as a whole." *Id.*

■ The Ninth Circuit uses a two-part test to determine "substantial similarity." First, the "extrinsic"/"objective" test "objectively considers whether there are substantial similarities in *both* ideas and expression." *Apple Computer*, 35 F.3d at 1442 (emphasis in original); *see also, e.g., Smart Inventions, Inc. v. Allied Communications Corp.*, 94 F.Supp.2d 1060, 1065 (C.D.Cal.2000). Second, the "intrinsic"/"subjective" test looks for substantial similarity in the "total feel and concept of the works." *Data East USA, Inc. v. Epyx, Inc.*, 862 F.2d 204, 208 (9th Cir.1988) (citation and internal quotation marks omitted). While courts often engage in "analytic dissection" for the "extrinsic" test, the "intrinsic" test asks "whether the ordinary, reasonable person would find the total concept and feel of the works to be substantially similar." *Three Boys Music*, 212 F.3d at 485.

■ Only the "extrinsic" test is generally employed at the summary judgment stage, as the "intrinsic" test is generally reserved for the finder of fact. *See, e.g., Kouf v. Walt Disney Pictures & Televi-* sion, 16 F.3d 1042, 1045 (9th Cir.1994); *Three Boys Music*, 212 F.3d at 485. "A plaintiff avoids summary judgment by satisfying the extrinsic test which makes similarity of the works a triable issue of fact.... [A] plaintiff who cannot satisfy the extrinsic test necessarily loses on summary judgment, because a jury may not find substantial similarity without evidence on both the extrinsic and intrinsic tests." *Kouf*, 16 F.3d at 1045. *See Shaw*, 919 F.2d at 1359–61 (creating this rule).

The "extrinsic" test usually requires "analytic dissection," and may be helped by the testimony of experts. *See Three Boys Music*, 212 F.3d at 485; *Dr. Seuss Enterprises*, 109 F.3d at 1398 n. 3 ("'Analytic dissection' focuses on isolated elements of each work to the exclusion of other elements, combination of elements, and expressions therein.") "Analytic dissection" requires breaking the works compared down into their constituent elements, and comparing those elements for proof of copying as measured by "substantial similarity." It is the copyright plaintiff's burden to identify the elements for this comparison. *See, e.g., Three Boys Music*, 212 F.3d at 485 ("Initially, the extrinsic test requires that the plaintiff identify concrete elements based on objective criteria."). Though the elements compared may vary based on the type(s) of works compared, in literary or dramatic works typical objective elements include plot, theme, dialogue, mood, setting, pace, characters, and sequence of events. *See Kouf*, 16 F.3d at 1045; *Shaw*, 919 F.2d at 1359, 1362 (citations omitted); *Smart Inventions*, 94 F.Supp.2d at 1065. It is these typical literary elements upon which Plaintiff relies for comparison. *See* Copyright Opposition at 15–21.

In comparing these elements, the Court must filter out any parts of the copyrighted work which are not protected. "Because only those elements of a work that

are protectable and used without the author's permission can be compared when it comes to the ultimate question of illicit copying, we use analytic dissection to determine the scope of copyright protection before works are considered 'as a whole.'" *Apple Computer*, 35 F.3d at 1443. First, therefore, "[a]nalytic dissection requires the court to separate unprotectable facts and ideas from potentially protectable expressions." *Smart Inventions*, 94 F.Supp.2d at 1065–66; *see Apple Computer*, 35 F.3d at 1443. Second, "the court must then apply the relevant limiting doctrines in the context of the particular medium involved, through the eyes of the ordinary consumer of that product." *Apple Computer*, 35 F.3d at 1443. These "limiting doctrines" include the "merger" and *"scenes a faire"* doctrines. *See id.* at 1444. Finally, "[h]aving dissected the alleged similarities and considered the range of possible expression, the court must define the scope of the plaintiff's copyright—that is, decide whether the work is entitled to 'broad' or 'thin' protection." *Id.* at 1443. This "scope of protection" sets the appropriate standard for a subjective comparison of the works to determine whether, as a whole, they are sufficiently similar to support a finding of illicit copying. *See id.*

### 3. Unprotectable Elements and Limiting Doctrines

The Court must therefore, for purposes of the "extrinsic" test, and the "analytic dissection" associated therewith, separate what is protectable in Plaintiff's Rice Video from what is not. The Court is bound by the idea vs. expression dichotomy, and by limiting doctrines, in defining the scope of protection to which Plaintiff is entitled.

### a. Ideas, Facts, and Other Unprotected Materials

 "It is an axiom of copyright law that ideas are not protected." *Smart Inventions*, 94 F.Supp.2d at 1066; *see Data*

*East*, 862 F.2d at 207; 17 U.S.C. § 102. Only the particular *expression* of an idea is entitled to copyright protection. *See id.* Similarly, facts are not themselves copyrightable, though original compilations/arrangements of facts may be. *See Feist*, 499 U.S. at 347–48, 111 S.Ct. 1282. And though obvious, it also bears repeating that an author may claim protection only in those elements of a copyrighted work which are *original* with that author; no protection may adhere in facts, ideas, scenes, characters, themes, or other elements borrowed from another author, from the "public domain," or which are otherwise not a plaintiff's original expression. *See id.*

### b. The "Merger" of Idea With Expression

Separation of idea from expression is made more difficult where an idea and its form(s) of expression necessarily coincide. This is typically the case where there is only one way, or a limited number of ways, to express a particular idea, and the idea is said to "merge" with its expression. "The idea and the expression will coincide [or merge] when the expression provides nothing new or additional over the idea." *Krofft*, 562 F.2d at 1168. In such a case, "[a] high degree of similarity" between an idea and its expression is "inevitable." *Shaw*, 919 F.2d at 1360 (citations omitted). "Where idea and expression are unified, extending copyright protection to the objective elements of expression would grant the copyright holder a monopoly over the ideas expressed in the works, in violation of 17 U.S.C. § 102(b)." *Id.; see also Apple Computer*, 35 F.3d at 1443 ("similarities derived from the use of common ideas cannot be protected . . ." under copyright).

### c. More Limited Protection for *Scenes a Faire*

 Closely related to the "merger" doctrine is the similar doctrine of "*scenes a*

faire," or " 'scenes which "must" be done.' " 4 *Nimmer* § 13.03[B][4] at 13–72 (citation omitted). *Scenes a faire* are forms of expression that are " 'as a practical matter indispensable, or at least standard in the treatment of a given [idea].' " *Apple Computer*, 35 F.3d at 1444 (citation and internal quotation marks omitted). *See also* 4 *Nimmer* § 13.03[B][4] at 13–73 ("similarity of incidents or plot that necessarily follows from a common theme or setting."). Though what may constitute *scenes a faire* will vary depending on the medium and the subject matter of the particular copyrighted work at issue, the question is whether that particular expression is so typical of the genre (e.g., a car chase in an action film) as to be "indispensable."

### d. Effects of These Limitations on Copyright Liability

■ The Court must segregate protected elements of the copyrighted work from facts and ideas, elements borrowed from other sources, or other unprotected elements. "When similar works resemble each other only in those unprotected aspects, then defendant prevails ... When the similarity goes to protected elements, plaintiff prevails." 4 *Nimmer* § 13.03[B][2] at 13–58.1 n. 136.2. Furthermore, where even the ostensibly protected elements are similar only because an idea has a single or limited number of forms of expression, the Court discounts the significance of these similarities. And where a copyrighted work is composed largely or primarily of unprotected elements, or elements "limited" by "merger" or "*scenes a faire*," it receives "thin" rather than "broad" copyright protection. *See Feist*, 499 U.S. at 357–58, 111 S.Ct. 1282; *Apple Computer*, 35 F.3d at 1444; *Sega Enterprises*, 977 F.2d at 1524.

■ Where a copyrighted work is entitled only to "thin" protection, it will be guarded only against "virtual identity," or against "nearly identical copying." *Apple Computer*, 35 F.3d at 1446, 1444. There is a continuum between highly original works entitled to the most "broad" protection available under copyright, at one end, and those works of a primarily factual or functional nature, or in which protected elements are outweighed by the non-protected, or less protected, to which only "thin" protection is afforded, at the other. *See id.* at 1446–47. "Which end of the continuum a particular work falls on is a call that must be made case by case." *Id.* at 1447. The less original, or non-necessary, components there are, the closer to identical an allegedly infringing work must be before it may be a basis for copyright suit. *See also Harper House, Inc. v. Thomas Nelson, Inc.*, 889 F.2d 197, 207–08 (9th Cir. 1989); *Frybarger v. International Business Machines Corp.*, 812 F.2d 525, 529–30 (9th Cir.1987); *Landsberg v. Scrabble Crossword Game Players, Inc.*, 736 F.2d 485, 488 (9th Cir.1984).

### 4. Comparison of Plaintiff's and Defendants' Works

■ With these principles in mind, the Court therefore engages in an "analytic dissection" and comparison of the works at hand, to assess whether Defendants' Television Specials are so "substantially similar" to Plaintiff's Rice Video as to support a finding of illicit copying. Obviously, in the abstract there is some level of similarity between the two videos involving masked magicians revealing tricks/illusions. *See Berkic v. Crichton*, 761 F.2d 1289, 1293 (9th Cir.1985) ("At a very high level of generality, the works do show a certain gruesome similarity."). However, what is important is whether the *protectable* "concrete elements" thereof are sufficiently similar. *See id.*

In this case the Court concludes, as did the trial and appellate courts in *Berkic*, that they are not. *See id.* at 1293–94. Summary judgment is not highly favored on issues of substantial similarity in copyright cases. *See Smith*, 84 F.3d at 1218; *Shaw*, 919 F.2d at 1355. However, nor is summary judgment on this issue either prohibited or subjected to a "heightened standard." *See Kouf*, 16 F.3d at 1045 n. 3 (9th Cir.1994). Instead, "summary judgment is appropriate if 'no reasonable juror could find substantial similarity of ideas and expression[,]' viewing the evidence in the light most favorable to the nonmoving party." *Id.* at 1045. Summary judgment may be particularly appropriate where a court determines that a substantial portion of a copyrighted work is non-protected, or subject to limiting doctrines. *See Shaw*, 919 F.2d at 1361 ("Where idea and expression merge, a court is well-suited to make the required determination of similarity on a motion for summary judgment."). Where a court determines, through analytic dissection and application of limiting doctrines, that the work in question contains less original expression than it might at first appear, and is therefore entitled to something less than "broad" protection under the Copyright Act, it is appropriate for the Court to apply these doctrines in the context of a summary judgment.

In this case, it is undisputed that Plaintiff may claim no right to the particular tricks (or their explanations) which are included in both the Rice Video and the first episode of the Television Specials. *See* Copyright UF ¶ 43; Copyright GI ¶ 43. These are apparently in the public domain. It is his particular *presentation* of those illusions which Plaintiff claims has been infringed. Specifically, Plaintiff points to alleged similarities in "character," dialogue, mood, pace, setting, and sequence of events. *See* Copyright Opposition at 15–20.

In that the tricks/illusions themselves are in the public domain, Plaintiff's copyrighted work is essentially a *compilation* of "facts" equally available to any subsequent author who wishes to make use of the same freely-available tricks and explanations in their own work.[22] Though Plaintiff's video is obviously more creative and original than a typical factual compilation, or the telephone directory which was at issue in *Feist*, 499 U.S. at 347–48, 111 S.Ct. 1282, it is certainly analogous in the sense that Plaintiff may not rely on the tricks themselves to show substantial similarity, and must rely on the sequence of those tricks, on the parameters within which they are presented, and on elements of the Rice Video *aside* from the tricks which are distinctive/original. Moreover, the following analysis of factual works would seem to apply:

> Factual works are different. Subsequent authors wishing to express the ideas contained in a factual work often can choose from only a narrow range of expression.... Therefore, similarity of expression may have to amount to verbatim reproduction or very close paraphrasing before a factual work will be deemed infringed. [Citation].

*Landsberg*, 736 F.2d at 488 (citation omitted). Because Plaintiff's work is presenting the "facts" of the tricks/illusions he (and also the Defendants) reveal, there are a limited number of ways to do so.

---

22. Indeed, as Defendants' expert (Lanham) points out, explaining the secrets behind magic tricks is in itself nothing new. *See* Lanham Report at 4 (citing texts describing exposure of tricks as far back as Greek antiquity, and English texts explaining magic from the sixteenth century). There is also, as Lanham demonstrates, a "flourishing ... print and video industry in showing how tricks are done." *Id.*

In other words, there may be only so many ways to make a show about revealing the secrets of known magic tricks. As the following makes clear, whether this is called "merger," "*scenes a faire*," or something else, this affects how "broad" a copyright Plaintiff has.

The Court's "analytic dissection" of the Rice Video according to its constituent elements proceeds in the order in which those elements are argued by Plaintiff. Accordingly, the Court hereunder compares the Rice Video and the Television Specials for substantial similarity in "character," "dialogue," "mood and pace," and "sequence of events."

### a. The "Character" of the Mystery (and Masked) Magician

Plaintiff's primary focus is on alleged similarities in what he terms the "character" of the protagonist of his video, the Mystery Magician, and the "character" of the protagonist of the Television Specials, the Masked Magician. Plaintiff asserts that "[t]he plot, setting, sequence of events, dialogue (or monologue), mood, tone and pace are all directly driven from the persona of the *Masked Magician*, a character accurately described by (Plaintiff's expert Kaufmann) as a magician anti-hero who embarks upon a simple, direct approach to the age-old 'no-no' of telling tales out of school by revealing highly secret magic illusions to the public." Copyright Opposition at 14–15. Plaintiff claims that the "character" of the Mystery Magician is in itself copyrightable, quite apart from its appearance as an "element" of the Rice Video as a whole. *See id.* at 15. Plaintiff claims that the Mystery Magician is a "graphical character," and that its is "the story being told." He therefore

claims that this "character" alone, and the alleged similarities between it and the Masked Magician, are enough to sustain a viable claim of copyright infringement.[23]

Plaintiff is mistaken in his belief that the Mystery Magician is the sort of "character" to which copyright protection may attach quite apart from the copyrighted work in which that character appears or is depicted. The kinds of characters to which this kind of protection is extended are those of the stature of Godzilla, James Bond, Superman, Rocky Balboa, and/or well-known Disney comic book characters such as Mickey and Minnie Mouse, Donald Duck, and Goofy. *See Toho Co., Ltd. v. William Morrow and Company, Inc.*, 33 F.Supp.2d 1206, 1215 (C.D.Cal.1998) (Godzilla); *Metro–Goldwyn–Mayer, Inc. v. American Honda Motor Co., Inc.*, 900 F.Supp. 1287, 1296 (C.D.Cal.1995) (James Bond); *Warner Bros., Inc. v. American Broadcasting Cos., Inc.*, 720 F.2d 231, 240–45 (2d Cir.1983) (Superman); *Anderson v. Stallone*, 1989 WL 206431, *7 (C.D.Cal. 1989) (Rocky Balboa); *Walt Disney Productions v. Air Pirates*, 581 F.2d 751, 755 (9th Cir.1978) (Disney characters). The defining characteristic of these protectable characters is that they are larger than a single production or visual representation, and in essence transcend the boundaries of any one copyrighted work.

There are, it seems, essentially two tests for copyrightability of a "character" apart from the copyrighted work in which he or she (or it) appears. The character must either be "the story being told" or, for visually depicted characters, be "sufficiently delineated" or fleshed out to warrant separate protection. *See Toho*, 33 F.Supp.2d at 1215–16; *Metro–Goldwyn–*

---

**23.** Plaintiff relies heavily on the Kaufmann expert opinion for a conclusion that the Mystery Magician is the "story being told" in the Rice Video. Neither expert opinion in this case is very relevant to the conclusions drawn by the Court; the Court does not rely on either.

*Mayer*, 900 F.Supp. at 1295–96. However, this requires significant *development* of the character. "[T]he less developed the characters, the less they can be copyrighted; that is the penalty an author must bear for marking them too indistinctly." *Olson*, 855 F.2d at 1452 (alteration in original) (citation omitted). Here, Plaintiff cannot satisfy either test for the Mystery Magician.

First of all, though perhaps not an explicit requirement, cases finding copyrightable characters have typically seemed to implicitly require that the characters appear several times, in different books, movies, or other presentations, and that their attributes have been *consistently* portrayed in those various appearances. *See, e.g., Toho*, 33 F.Supp.2d at 1216 ("In this case, Godzilla has likewise developed a constant set of traits that distinguish him/her/it from other ... characters."); *Metro–Goldwyn–Mayer*, 900 F.Supp. at 1296 ("[B]ecause many actors can play Bond is a testament to the fact that Bond is a unique character whose specific qualities remain constant despite the change in actors."). This is consistent with the requirement that a protectable character comprise "the story being told," and/or be so highly "delineated," in that the crucial question is whether what is important is the character itself, or the story in which it appears. *See Metro–Goldwyn–Mayer*, 900 F.Supp. at 1296 ("Indeed, audiences do not watch Tarzan, Superman, Sherlock Holmes, or James Bond for the story, they watch these films to see their heroes at work."). That the Mystery Magician has appeared in only one presentation, which was not even widely distributed to the public, belies Plaintiff's claim that this "character" should itself be subject to protection.

Secondly, the Mystery Magician is not "the story being told" in the Rice Video, nor is his "character" highly "delineated"

therein. Plaintiff's attempts to paint the Rice Video as the heroic tale of a magician defying the "magic community" for the altruistic purpose of inspiring renewed interest in magic notwithstanding, it is clear that the "story" of the Rice Video is the actual revelation of the tricks. Indeed, the "character" of the Mystery Magician is not "fleshed out" at all. He is kept intentionally anonymous, and is quite replaceable.

The Mystery Magician is more notable for its very *absence* of any "character" traits than for the *presence* thereof. Aside from those times when the Mystery Magician speaks (through voice-over), and/or whatever clues might be picked up from his movement, demeanor, and the appearance(s) of his assistants, he is essentially *without* identity, and is merely a non-specific "magician" character in the classic garb (tuxedo, white shirt, and tails) of that profession. If the character of Sam Spade in "The Maltese Falcon" may not be protected by copyright apart from the tale in which he appears, as the Ninth Circuit found nearly fifty years ago, in *Warner Bros. Pictures, Inc. v. Columbia Broadcasting System, Inc.*, 216 F.2d 945, 950 (9th Cir.1954), without question the Mystery Magician "character," which has (as yet) appeared in only a single, meagerly-distributed, video on the secrets of magic, and whose "character" is notable more for its *lack* of "delineation" than for its clear demarcation, does not create a basis for copyright protection separable from that afforded to the Rice Video itself.

Of course, this does not mean that the Mystery Magician is not still relevant as a "concrete element" of the Rice Video for purposes of the Court's "analytic dissection" of that copyrighted work. *See Olson*, 855 F.2d at 1452–53 ("[S]uch lightly sketched characters may be descriptive enough to sustain a finding of infringement where other *Berkic* factors are also copied

...."). It simply means that this "character" is only one among many such elements which are isolated and compared under the Court's "substantial similarity" analysis.

For reasons similar to those preventing the Mystery Magician from being a separably-protected "character," however, there is also no "substantial similarity" between this "character" and the "character" of the Masked Magician which appears in the Television Specials.

As an initial matter, the Court notes that the two characters, though perhaps similar in theme and in the general contents of their actions (revealing tricks/illusions), are not particularly similar in their appearances, their demeanors, or even the roles that they play in their respective productions. For instance, their costumes share only the fact that they are predominantly black, are men's clothes, and feature a mask to hide the respective magicians' faces. The mask which the Masked Magician wears is really quite different from that worn by Plaintiff (molded, fitted rubber with dramatic white tiger stripes vs. all-black, unfitted, cloth stocking mask/hood), as is his outfit comprised of a black turtleneck, black jacket, black pants, and black gloves (compared to the Mystery Magician's tuxedo with white shirt, black bow tie, and (at least in one trick) white gloves). And, to the extent that their "characters" are defined, Plaintiff's Mystery Magician is far more of a teacher than is Defendants' Masked Magician. His performance is less flamboyant and slower-paced, and he does not engage in any of the physically challenging tricks/illusions which are performed by the Masked Magician in the Television Specials. Perhaps most importantly, the Mystery Magician speaks aloud to the audience, while the Masked Magician (except for his closing monologue) makes no sound during any of the four episodes of the Television Specials.

This conclusion is reinforced by the finding that it would appear there are a limited number of ways to express the "idea" of a magician revealing the secrets of tricks/illusions while being disguised to protect his identity. As Plaintiff admits, he cannot *own* this "idea." *See* Rice Depo. at 297. To some degree, this idea "merges" with the "expression" of a masked magician revealing tricks, as shown by the Rice Video, the Television Specials, *and* "Secrets Revealed."

The Mystery Magician, in fact, is a "prototype" of the "classic magician" or "illusionist," with his tuxedo and tails, his macabre demeanor, and his attempts to appear "mysterious" and enigmatic. But his character is, aside from these "classic" traits, expressly left undefined in the Rice Video. Therefore, to find that Defendants' own masked magician, different in every way except for those "classic" traits which are ostensibly common to all stage-performing magicians, is "substantially similar" to Plaintiff's Mystery Magician, would be to afford Plaintiff a monopoly on *any* (male) "magician character," so long as he is wearing a mask of any kind, and revealing magic tricks.

Plaintiff cannot claim to own the idea of a magician disguising himself for the purpose of revealing tricks, nor the notion of any magician wearing a mask. His claim to own the combination of these traits is no more compelling. Plaintiff left his Mystery Magician to be little more than an undifferentiated cipher transmitting to his audience the secrets of magic tricks and illusions. By so doing, his particular "expression provides nothing new or additional over the idea." *Krofft*, 562 F.2d at 1168. Though the "merger" of this idea with its expression is not absolute, it is quite substantial. In the alternative, the "masked

magician" constitutes a *"scenes a faire "* in the genre of "revealing magic tricks." Plaintiff's "character" is, at best, entitled only to "thin" protection from illicit copying.

Accordingly, the Court finds that Defendants' Masked Magician is not substantially similar to Plaintiff's Mystery Magician as a matter of law. Due to the "thinness" of the protection to which Plaintiff's "character" is entitled, the Court would require that any allegedly infringing character be nearly identical. No reasonable. juror could find that the Masked Magician fits this standard, on these facts.

### b. Alleged Similarities in Dialogue/Monologue

Plaintiff's secondary allegation is that the opening monologues to the Rice Video and TV Special 1, and the closing monologues to the Rice Video and TV Special 4, are "substantially similar" based on the similarities in meaning conveyed, and in conformity with the alleged "character" driving each of the works under review. *See* Copyright Opposition at 17–19. However, Plaintiff cannot point to any actually identical or even "substantially similar" dialogue, whether in these opening and closing monologues, or in the remainder of the two works. His argument that the dialogue is similar in "theme" or "effect" is unavailing, as this approaches an argument that Plaintiff is entitled to claim a monopoly over the "idea" of revealing magic tricks, or the "idea" of doing so for altruistic reasons, or the "idea" of having to keep one's identity hidden for fear of retribution and/or ridicule.

Moreover, it is again true that to some extent these "ideas" are nearly synonymous with the "expression" of at least an opening speech about how tricks have been passed down through the ages, along with the "magicians' code" that the secrets of those tricks should never be revealed to the viewing public. The same might be said of a closing speech about wanting to "inspire" viewers, particularly children, to love and appreciate magic and magicians. These expressions nearly "merge" with the whole idea of these respective productions, or are at least *"scenes a faire "* within this genre. Accordingly, the Court is again unable to find "substantial similarity" absent a near identity between the dialogue/monologue in Plaintiff's Rice Video, and that in Defendants' Television Specials. Plaintiff admits that no such exact copying (or even a closeness of wording that might be remarkable) is present. Accordingly, the dialogue is also not substantially similar.

### c. The Mood and Pace of the Two Presentations

Plaintiff argues that the "overall mood in both the plaintiff's earlier video and the defendants' later specials [is] one of secrecy and mystery." Copyright Opposition at 19. On this basis, Plaintiff claims substantial similarity. However, Plaintiff's argument reveals its own flaw, as Plaintiff seeks to separate the inseparable: it is quite clear that a "mood" of "secrecy and mystery" must "merge" with a show that is about the "mysteries of magic," and revelation thereof. It is at minimum a *"scenes a faire "* of the genre, requiring that there be substantial identity between Plaintiff's and Defendants' works.

No such identity is found, as it is clear that the mood of the two works is actually quite different. Plaintiff's Rice Video is far more laden with story-telling and detailed explanation, and adopts a careful, meticulous tone. Defendants' Television Specials, on the other hand, have a fairly sarcastic, even cynical, tone, in which the audience is in on the joke, and the joke is almost at the expense of professional magicians and their relatively simple illusions.

To the extent possible, Plaintiff's Mystery Magician seems intent on keeping alive the mystery of the performance of magicians (if not the mystery of the actual tricks which are revealed), while Defendants' Masked Magician (or more accurately, the narrator Mitch Pileggi) seems to almost scoff at the simplicity of most of the tricks and illusions.

For similar reasons, the pace of the two presentations is also quite different. This is illustrated by the fact that, in TV Special 1, the Masked Magician performs *and reveals* eleven complicated tricks in roughly the same amount of time that it takes the Mystery Magician to perform twelve tricks (many of which are less complicated) and only reveal *six*. The Television Specials are *much* more fast-moving.

#### d. Alleged Similarities in the Respective Settings

Plaintiff also claims substantial similarity in the fact that both stage shows "are set in cavernous, secret, empty and minimalist locations at night." Copyright Opposition at 20. However, there is no "substantial similarity" in setting. The Rice Video takes place in an empty *theater*, the floor of which is largely obscured for most of the video by dry ice fog. The Television Specials, by contrast, take place in a very large abandoned warehouse, the dimensions of which (in both the vertical and horizontal planes) far exceed those of the Rice Video's rather diminutive stage. Though both stages are relatively spare, the interior of the warehouse in which the Television Specials were filmed is ringed with scaffolding, and light fixtures, which give the Television Specials a "second story" within which action can take place. There are very few similarities between these settings, except to the extent that they each are consistent with a "secret" tone. For example, even the assistants to the magicians are notably different.

In addition, any similarities that do exist would once again be primarily a function of the genre into which both presentations fall. In other words, the fact that the respective shows were filmed in a "secret" location, without an audience, would seem to be required by the "idea" that is being expressed: the revelation of magic secrets. Similarly, the shadowy nature of the lighting, and the effects, for both performances, is a necessary function of the fact that many, if not all, of the tricks/illusions performed depend on sleight of hand, misdirection, and visual deception, all of which are far easier to accomplish without the light of day, or bright lighting. There is a reason that magic shows are rarely performed in daylight. Therefore, the secret night-time setting constitutes a mere "*scenes a faire.*"

#### e. Comparison of the Overall Sequence of Events

Finally, Plaintiff claims "substantial similarity" in the basic "plot" and "sequence of events" expressed in both the Rice Video and the Television Specials. Specifically, Plaintiff claims that the Rice Video and Television Specials each feature, in this order: (1) a man's feet, or a man, walking into the frame; (2) the audience being told they are about to see secret stage illusions performed; (3) viewers also being told that the renowned magician performing the illusions will break his code of silence to reveal the secrets behind closely guarded illusions; (4) the audience being told that the magician is risking his entire career to do so, and will therefore be disguised; (5) the camera "eye" leading the audience into a "deserted area"; (6) a masked magician appearing, fully disguised, along with choreographed assistants; (7) the audience being told that the magician will use no trick photography or special effects to perform the illusions; (8) the magician first performing the illusion as if for a normal performance, and then re-performing as he

explains to the audience how it was done; and (9) the magician revealing himself, and intoning his "altruistic" reasons for "betraying" secrets. *See* Copyright Opposition at 20–21.

As the Court has already stated, at a sufficiently elevated level of abstraction, of course there are apparent similarities between the Rice Video and the Television Specials. However, Plaintiff's listing of purported commonalities in plot and sequence is writ entirely too large for purposes of "analytic dissection." Indeed, many of what he claims to be similarities in "plot" and "sequence" are really claims that the "dialogue" of the respective presentations is similar, if not in wording, at least in theme. The Court has rejected this argument. It also rejects Plaintiff's claimed similarity in plot or sequence.

First, there is no "substantial similarity" between the picture of the Mystery Magician's feet walking slowly down the ostensibly dark and abandoned street outside of the theater in which he will perform, and the opening of TV Special 1, in which Mitch Pileggi walks into the frame as the camera pans to the front of an abandoned warehouse. In fact, this points out one of the ways in which the "plot"/"sequence" of these two works is decidedly *not* "substantially similar": there is an *on-screen* host in the Television Specials, who is given at least as significant a role in the development of the "plot" as is the Masked Magician himself.[24] Second, the Court has already indicated that the second to fourth, seventh, and ninth "similarities" were part of and rejected under "dialogue," above.

*See supra* Part IV.A.4.b. Thus, no substantial similarity of "plot" or "sequence" may be based thereon. Third, the fifth claimed similarity (the "eye" of the camera leading the viewer to a deserted setting) was already covered as a claimed basis for similarity in "setting," above. *See supra* Part IV.A.4.d.

This leaves only the claimed similarities of the appearance of a masked magician, and the performance and then revelation of various stage illusions (the sixth and eighth claimed similarities). These, however, are the very encapsulation of the "idea" of both works.

Plaintiff cannot claim a monopoly in the expression of a stage magician appearing in a mask, or otherwise disguising his identity. Nor can he claim a monopoly in the idea of revealing magic tricks, or even, in this case, in the particular tricks or illusions revealed. His only possibility is to claim some direct copying in the *way* in which the tricks are revealed, the dialogue associated therewith, the sequence in which the tricks are revealed, or some other aspect of the particular "performance" which is captured on the Rice Video. He is unable to do so. Of the five tricks in common between the Rice Video and the Television Specials, only four are revealed by Plaintiff. Of those four, three are performed in slightly different ways during TV Special 1, and even the fourth (the Three Cube Box/Zig Zag Lady) is not performed in an identical fashion. Moreover, the four tricks that are both performed and revealed on both videos are performed in an entirely different order.

---

**24.** The Court is aware that it should not "inappropriately dissect *dissimilarities*" in its focus on "substantial similarity." *See Apple Computer*, 35 F.3d at 1446. Differences between the two works should never be *weighed* against similarities therein, as no amount of even obvious differences may impact a finding of substantial similarities. Nonetheless, this does not mean that the Court should wholly disregard differences which do exist, particularly where those differences belie a plaintiff's claim of substantial similarity in a certain element of the copyrighted work. Therefore, the Court notes this difference not as a "thumb on the scale" against finding substantial similarity, but only as an indicator that the "plot" of the two works is not similar.

There is no identity or even substantial similarity of dialogue surrounding the performance or revelation of the tricks, and it is not even the Masked Magician doing the talking.

Moreover, in that the tricks themselves are non-protected, and are therefore analogous to "facts," "ideas," or other items in the public domain which are available to subsequent authors to present in their own original works, Plaintiff's presentation thereof must be limited to a relatively "thin" level of copyright protection. Thus, there being no substantial identity between Plaintiff's version of these tricks and Defendants' version thereof, there is no "substantial similarity" for purposes of the Court's "extrinsic" analysis.

As described above, the same is true of each of those elements of the copyrighted work identified by Plaintiff. Accordingly, there is no reasonable basis for any juror to find "substantial similarity."

For these reasons, the Court concludes that there are no triable issues of fact as to Plaintiff's ability to satisfy the "extrinsic" test for "substantial similarity," and hence copyright infringement.[25] As a result, the Court concludes that Moving Defendants are entitled to judgment as a matter of law on Plaintiff's copyright claim (the First Claim for Relief). The Copyright Motion is therefore GRANTED. The First Claim for Relief is hereby DISMISSED, with prejudice.

**5. Independent Creation: Rebutting Proof of Copying**

 In the alternative, Moving Defendants also argue that despite any superficial similarities between the Rice Video

and their Television Specials, either or both the concept and the presentation therefor are independent creations of the Defendants involved in their production. Independent creation is an affirmative defense to infringement, that is invoked once a plaintiff's prima facie case of copying has been made. "By establishing reasonable access and substantial similarity, a copyright plaintiff creates a presumption of copying. The burden shifts to the defendant to rebut that presumption through proof of independent creation." *Three Boys Music*, 212 F.3d at 486. However, this Court's conclusion that there is insufficient similarity between Plaintiff's and Defendants' works to survive summary judgment makes unnecessary any discussion of this evidence of independent creation.

**B. The Trademark/False Advertising Motion: Second and Third Claims**

Plaintiff also purports to state claims under Section 43(a) (15 U.S.C. § 1125(a)) of the Lanham Act, and under the California Unfair Business Practices Act (Cal. Bus. & Prof.Code § 17200 *et seq.*). *See* Complaint ¶¶ 63–71. Though the bases for these claims are not always clearly articulated in Plaintiff's Complaint, it appears the Second Claim for Relief (for violations of the Lanham Act) is premised on essentially three separate allegations: (1) that Defendants failed to properly credit Plaintiff as the creator, author, originator, etc. of the Television Specials, and thereby falsely designated their origin; (2) that Defendants' Masked Magician "character" is likely to cause confusion with Plaintiff's Mystery Magician "character," and is thus an actionable false designation of origin; and (3) that Defendants made materially

---

25. Although it is not necessary in analyzing Moving Defendants' Copyright Motion, the Court also concludes that there is no triable issue of fact as to "substantial similarity" in the "total concept and feel" of the two works, based on its filtration of those elements of Plaintiff's work that cannot be considered for purposes of assessing similarity "as a whole." Therefore, the Court independently also finds that Plaintiff has not satisfied the "intrinsic" test.

false statements of fact in the production, promotion and sale of the Television Specials. *See* Complaint ¶¶ 65–67.

Plaintiff's Third Claim for Relief (under the California Unfair Business Practices Act) is totally devoid of any specifics as to the allegedly "unlawful, unfair or fraudulent business practice or act," and/or "unfair, deceptive, false or misleading advertising" to which it is addressed. Complaint ¶ 70. Presumably this claim is premised on the same conduct underlying the copyright and Lanham Act claims: e.g., alleged copyright violations, false designations of origin, and false statements to the public. This is confirmed by Plaintiff's own opposition papers, in which he argues that this Section 17200 claim (along with the remaining state law claims, the Eighth, Ninth, and Tenth Claims for Relief) "rises and falls" with his federal copyright and Lanham Act claims. Trademark/False Advertising Opposition at 12. Plaintiff does not separately articulate its legal basis or viability.

Moving Defendants seek summary adjudication of the Second and Third Claims for Relief (and by extension, the equitable remedies that are stated as the Eighth, Ninth, and Tenth Claims for Relief). They argue that the Lanham Act claim (Second Claim for Relief) should be dismissed because the "Mystery Magician" is not a valid mark, there is no likelihood of confusion between the Rice Video and the Television Specials, and Plaintiff cannot show that Defendants falsely advertised in violation of Section 43(a) of the Lanham Act. *See* Trademark/False Advertising Motion at 7–16. Moving Defendants also seek dismissal of the Section 17200 claim (Third Claim for Relief), arguing that it is wholly dependent on Plaintiff's unsupported copyright and Lanham Act claims. They also argue that the Section 17200 claim (as well as the Eighth through Tenth Claims for Relief) is preempted by the Copyright Act, and should be dismissed on this ground. *See id.* at 17–20.

Plaintiff responds that the "Mystery Magician" mark, and/or the "character" of the Mystery Magician, is/are cognizable for purposes of a false designation of origin claim under the Lanham Act (it does not appear Plaintiff seeks recovery under Section 17200 for this theory). He claims that application of the "*Sleekcraft* factors" supports his false designation of origin claim. *See* Trademark/False Advertising Opposition at 2–7. Further, Plaintiff claims that under both Lanham Act Section 43(a) and Section 17200, triable issues of fact remain as to whether Defendants made false statements in/around the Television Specials. *See id.* at 7–11. Finally, apparently conceding that his Section 17200 and other state law claims are preempted to the extent they seek to enforce rights protected by the Copyright Act, Plaintiff asserts that these claims are *not* preempted to the extent that they are based on false designation/false advertising. *See id.* at 12.

In what follows, the Court addresses in order the claimed bases for Plaintiff's Second Claim for Relief under the Lanham Act: (1) that Defendants failed to credit Plaintiff as a creator of/contributor to the Television Specials; (2) that Defendants have violated the Lanham Act's prohibition on false designations of origin which are likely to cause confusion among the purchasing public; and (3) that Defendants made false statements in advertising for the Television Specials.[26] The Court will

---

26. "(1) Any person who, on or in connection with any goods ... uses in commerce *any word, term, name, symbol or device, or any combination thereof, or any false designation* *of origin* ... or false or misleading representation of fact, which—(A) is *likely to cause confusion,* or to cause mistake, or to deceive

then address (4) Plaintiff's Third Claim for Relief under Section 17200, and finally (5) the remaining state law claims.

### 1. Alleged Failure to Credit Plaintiff as Author/Creator

Though Plaintiff makes no attempt to defend this basis for his Lanham Act claim in his Opposition to the instant Motion, it appears that Plaintiff is claiming that he ought to have been credited as the "real" author or creator of the ideas and expression in the Television Specials, rather than those individuals who were credited therein. It appears that this amounts to a claim of "reverse passing off," as was first outlined by the Ninth Circuit in *Smith v. Montoro*, 648 F.2d 602, 605 (9th Cir.1981) (claim by an actor removed from movie's credits).

■ "'Reverse passing off' or 'reverse palming off' occurs when a product is mislabeled to mask the creator's contribution. Moreover, 'failure to attribute authorship to a co-author resulting in only partially accurate designation of origin constitutes reverse palming off within the ambit of Section 43(a).'" *Cleary v. News Corp.*, 30 F.3d 1255, 1260 (9th Cir.1994); *see also Summit Machine Tool Mfg. Corp. v. Victor CNC Systems, Inc.*, 7 F.3d 1434, 1437 (9th Cir.1993); *Shaw*, 919 F.2d at 1364; *Lamothe v. Atlantic Recording Corp.*, 847 F.2d 1403, 1406 (9th Cir.1988). Therefore, it is possible for a plaintiff to state a claim under Section 43(a) where a product, or a work of authorship, is "really" his or her creation, and he or she has not been given credit. In this case, Plaintiff is essentially arguing that his Rice Video, or his Mystery Magician, were the "real" inspiration

for the Television Specials, and that Defendants ought to have given him an attribution. Though this is essentially a restatement of Plaintiff's claim under the Copyright Act, this sort of claim is cognizable in this Circuit.

■ However, Plaintiff's claim is meritless in light of this Court's holding that there is no substantial similarity between the Rice Video and any or all of the Television Specials. "[W]ithout substantial similarity there can be no claim for reverse passing off under section 43(a)." *Litchfield v. Spielberg*, 736 F.2d 1352, 1358 (9th Cir.1984). In other words, Plaintiff cannot claim his work is the "real" source for Defendants' Television Specials where they are not substantially similar to his copyrighted work. Moreover, even if Plaintiff's and Defendants' works *were* substantially similar, Plaintiff would not be able to state a Section 43(a) claim for "reverse passing off" unless he could show "bodily appropriation" of his copyrighted work. *See Shaw*, 919 F.2d at 1364; *Cleary*, 30 F.3d at 1261. This he cannot do.

### 2. Alleged False Designation of Origin/Trademark Infringement

In the alternative, Plaintiff claims a violation of Section 43(a) of the Lanham Act based on Defendants' use of a mark, or "character," likely to cause confusion with Plaintiff's use of the mark and/or the "character" of the "Mystery Magician." Plaintiff is not very clear about the protectable rights he is claiming, but it seems he argues infringement of his exclusive right *both* to the "mark" in the words

as to the *affiliation, connection, or association* of such person with another person, or as to the *origin, sponsorship, or approval* of his or her goods ..., or (B) in *commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin*

of his or her or another person's goods ... shall be liable in a civil action by any person who *believes that he or she is likely to be damaged* ..." 15 U.S.C. § 1125(a)(1)(A) and (B) (emphasis added).

"Mystery Magician," *and* to the "character" as defined in/by the Rice Video and his subsequent appearance(s) (e.g., *Entertainment Tonight* ). *See* Trademark/False Advertising Opposition at 2–7. Plaintiff's claim, and his arguments in opposition, appear to be mixing together several different doctrines and arguments, resulting in substantial confusion on Plaintiff's part as to the possibly viable bases for his claim.

■ Section 43(a) of the Lanham Act provides two bases for liability: "(1) false representations concerning the origin, association, or endorsement of goods or services through the wrongful use of another's distinctive mark, name, trade dress, or other device ..., and (2) false representations in advertising concerning the qualities of goods or services." *Waits v. Frito–Lay, Inc.,* 978 F.2d 1093, 1108 (9th Cir. 1992). It is the first of these upon which Plaintiff's claim alleging false designation of origin/infringement of a protected right depends. He makes essentially two arguments: that he may state a claim under Section 43(a) based on Defendants' use of a mark that is confusingly similar to his own "Mystery Magician" mark; and that he may state a claim under Section 43(a) based on Defendants' use of a "character" that is confusingly similar to his own Mystery Magician "character." Neither of these theories provides a basis for relief under Section 43(a) in this case, as is made clear by the following discussion.

■ As to Plaintiff's claim that Defendants have unlawfully infringed his rights to the mark "Mystery Magician," by using the confusingly similar title, wording, and/or product identification of the "Masked Magician," Plaintiff has not established his right to claim exclusive use of the "Mystery Magician" mark (or others confusingly similar) in the product realm of magic, revealing magician's secrets, or any other related product line. To maintain an action for false designation of origin (or unfair competition under California law), a plaintiff must prove that the defendant's use of the same or similar mark creates a likelihood of consumer confusion in the market. *See Murray v. Cable National Broadcasting Company,* 86 F.3d 858, 859 (9th Cir.1996). As a prerequisite to a claim based on infringement of trademark, however, a plaintiff must first establish that he or she has a valid, protectable mark. *See Brookfield Communications, Inc. v. West Coast Entertainment Corp.,* 174 F.3d 1036, 1046 (9th Cir.1999). Here, Plaintiff has not.

Plaintiff admits that he has no trademark registration for his "Mystery Magician" mark. Accordingly, he cannot claim the presumption of validity such registration brings. Therefore, Plaintiff must first establish the validity of his mark, by showing either that the mark is "inherently distinctive," or by showing that it has become distinctive through the acquisition of so-called "secondary meaning." *See Comedy III Productions, Inc. v. New Line Cinema,* 200 F.3d 593, 595 (9th Cir.2000). Marks are categorized in levels of increasing distinctiveness as (1) generic, (2) descriptive, (3) suggestive, (4) arbitrary, or (5) fanciful. The latter three categories of marks are deemed "inherently distinctive." *See Two Pesos, Inc. v. Taco Cabana, Inc.,* 505 U.S. 763, 768, 112 S.Ct. 2753, 120 L.Ed.2d 615 (1992). Moving Defendants argue that "Mystery Magician" is, at best, "descriptive." Plaintiff claims that his mark is "suggestive."

■ The Court agrees with Moving Defendants that Plaintiff's mark, "Mystery Magician" is descriptive, at best. "Although the distinction between descriptive and suggestive marks may be inarticulable, ... [t]he primary criterion is 'the imaginativeness involved in the suggestion,'" ...: " that is, how immediate and direct is

the thought process from the mark to the particular product." *AMF Incorporated v. Sleekcraft Boats*, 599 F.2d 341, 349 (9th Cir.1979). Here, there is almost no "thought process" required to go from the "Mystery Magician" mark to that "product" which it ostensibly *describes:* a magician who is mysterious. Accordingly, Plaintiff's mark is merely descriptive.

■ As a result, Plaintiff must make a showing of "secondary meaning" in order to claim any protectable interest in the "Mystery Magician" mark. Factors considered in determining whether secondary meaning has been achieved include: (1) whether actual purchasers of the product bearing a claimed mark associate the mark with the producer, (2) the degree and manner of advertising under a claimed mark, (3) the length and manner of use of a claimed mark, and (4) whether use of a claimed mark has been exclusive. *See Committee for Idaho's High Desert, Inc. v. Yost*, 92 F.3d 814, 822 (9th Cir.1996). Association of a mark with a particular product is most often proven by use of consumer surveys, though where there has been substantial advertising under the mark no such survey is explicitly necessary for secondary meaning. *See id.*

Here, Plaintiff has provided almost no evidence of any secondary meaning. He admits that he has commissioned no consumer survey, and the facts indicate that sales, promotion, and advertising of the Rice Video were extremely limited. Plaintiff can point to no widespread evidence of association of the "Mystery Magician" mark in the minds of the consuming public with the product of the Rice Video.

Indeed, the only "evidence" of secondary meaning to which he can point is the alleged "celebrity" he allegedly achieved at the time his videotape was released, based on the "furor [it] created within the magic community." Trademark/False Advertising Opposition at 4. The evidence to which Plaintiff points establishes no such thing; at best it may show that there was a brief period of news coverage of the Rice Video at its release. This does not establish that consumers would associate the "product" of a video about revealing magicians' secrets with the "Mystery Magician" mark, even at the time the Rice Video was released in 1986, let alone eleven years later, in 1997.[27]

Plaintiff has made no showing of secondary meaning associated with his merely descriptive "Mystery Magician" mark, and therefore has failed to establish a valid trademark, and a right to protection. As a result, Plaintiff cannot state a Section 43(a) claim on this basis. The Court need not even engage in "likelihood of confusion" analysis, as Plaintiff's failure to establish a protectable mark would make this a mere-

---

**27.** Plaintiff claims there is no need for a commissioned survey in light of the fact that he has produced evidence of "actual confusion" between his product and Defendants' (by a single distributor). Again, Plaintiff has substantially misunderstood the relevant doctrine. He cites to cases stating that proof of actual confusion is strong proof of a "likelihood of confusion." *See, e.g.,* Trademark/False Advertising Opposition at 5 (citing, *inter alia, Rodeo Collection, Ltd. v. West Seventh*, 812 F.2d 1215, 1219 (9th Cir.1987)). However, this evidence of "likelihood of confusion" only becomes relevant *after* a plaintiff has first satisfied the "validity" prong of the trademark analysis. A mark must first be "inherently distinctive" or have acquired secondary meaning, and *then* the court examines the "likelihood of confusion" as between the plaintiff's valid mark and the defendant's infringement. In other words, although actual confusion is strong evidence of there being a "likelihood of confusion," this evidence is irrelevant to the initial required showing of secondary meaning, which is often shown by use of commissioned consumer surveys, or extensive advertising.

ly superfluous exercise. *See Comedy III,* 200 F.3d at 595.

Similarly defective is Plaintiff's claim to a protectable mark in the "character" of the Mystery Magician. Though the exact basis upon which Plaintiff asserts a right to protection of this "character" is not clear (his arguments largely repeat and/or blend into those he made in favor of finding *copyright* protection for this character), it seems that Plaintiff is making a "false endorsement" claim, based on *Wendt v. Host International, Inc.,* 125 F.3d 806, 812 (9th Cir.1997) and *Waits,* 978 F.2d at 1110. These cases stand for the proposition that it is possible to make out a Section 43(a) claim where use of a distinctive characteristic (e.g., voice, likeness) of a "celebrity" without permission would falsely imply "endorsement" of a product.[28]

In other words, Plaintiff appears to be claiming that the Mystery Magician "character" is a "celebrity" whose visage is well-known, and that Defendants' use of a similar "character" was consciously designed to capitalize on the celebrity of the Mystery Magician "character." This completely distorts the "false endorsement" claim identified in *Waits* or *Wendt. See Comedy III,* 200 F.3d at 595 (describing a similar attempt to base a Section 43(a) claim on the Three Stooges' characters as a "fanciful argument"). Plaintiff cannot be allowed to use the Lanham Act to "circumvent" the Copyright Act, by attempting to claim trademark protection for a "character" unprotected thereby. *See id.*

Accordingly, Plaintiff has wholly failed to make out even a prima facie case of

"false association" (false designation of origin and/or false endorsement) under Section 43(a) of the Lanham Act. Thus, this second basis for Plaintiff's Second Claim for Relief must also fail.

### 3. False Advertisements Actionable Under Section 43(a)

More successful, however, is Plaintiff's claim that Defendants made materially false statements to the public both during, and for purposes of promotion of, the Television Specials. Under the second available basis for Section 43(a) liability, Defendants may be liable for "false representations in advertising concerning the qualities of goods or services." *Waits,* 978 F.2d at 1108. The allegedly false statements include those which appeared on the box for TV Specials 1 and 2, when they were re-packaged into a single videotape for sale.

In order to make out a false advertising claim, Plaintiff must prove that: (1) in an advertisement, Defendants made false statements of fact about their product or the product of another; (2) those false advertisements actually deceived or have the tendency to deceive a substantial segment of their audience; (3) the deception is material, in that it is likely to influence the purchasing decision; (4) the Defendants caused the falsely advertised goods to enter interstate commerce; and (5) Plaintiff has been or is likely to be injured as a result, either by direct diversion of sales, or by lessening of good will. *See Summit Technology, Inc. v. High–Line Medical Instruments Co.,* 933 F.Supp. 918,

---

**28.** "A false endorsement claim based on the unauthorized use of a celebrity's identity is a type of false association claim, for it alleges the misuse of a trademark, *i.e.,* a symbol or device such as a visual likeness, vocal imitation, or other uniquely *distinguishing* characteristic ... likely to confuse consumers as to the plaintiff's sponsorship or approval of the product." *Waits,* 978 F.2d at 1110. It appears that this "false endorsement" claim is essentially equivalent to the state-law right of publicity (the right to control one's own well-known voice, likeness, etc.). *See, e.g., Wendt,* 125 F.3d at 810; *Waits,* 978 F.2d at 1099 (discussing California right of publicity).

929 (C.D.Cal.1996). Moving Defendants argue that Plaintiff fails this test: they claim the "false" statements were mere "puffery," and were in any case immaterial. The Court finds that issues of fact sufficient to stave off summary judgment remain.

First, there are a number of literally false statements to which Plaintiff is able to point, from host Mitch Pileggi's claim that this is the "first time on television" that these tricks will be revealed (belied, if not by Plaintiff's appearance on *Entertainment Tonight*, at least by the prior 1993 or 1994 broadcast of the "Secrets Revealed" show, in which the Woman Sawed in Half trick was *previously* revealed), to the numerous claims on the packaging of the "Volumes I & II" set of TV Specials 1 and 2 that the tricks revealed therein are being shown "at last" and "finally," that these tricks have "never before" been revealed, and that "for the first time," viewers will learn the secret behind the Woman Sawed in Half. *See* Exhibit 43 to Sackey Decl.

Second, the Court cannot find these statements mere "puffery" as a matter of law. Puffery generally involves vague, highly subjective claims, as opposed to specific, factual assertions. *See Summit*, 933 F.Supp. at 931 ("Puffery is often described as 'involving outrageous generalized statements, not making specific claims, that are so exaggerated as to preclude reliance by consumers.'") (quoting *Cook, Perkiss & Liehe v. Northern California Collection Service, Inc.*, 911 F.2d 242, 246 (9th Cir.1990)). Here, Defendants' assertion that this program was the "first" to reveal the tricks contained therein, *even in the absence of Plaintiff's prior video*, is "factual" and false, and is not so "outrageous" that no ordinary consumer could rely on it.

Third, while Plaintiff may have a difficult time establishing the materiality of these false statements (in terms of their likelihood to influence a consumer's purchasing decision), the Court is not prepared to decide this issue on summary judgment. As with Moving Defendants' assertion that the statements are mere "puffery," this is a matter of individual judgment, which is best left to the ultimate trier of fact.

Based on the foregoing, the Court concludes that Plaintiff has failed to raise a triable issue of fact with regard to his claim for trademark infringement/false designation of origin under Lanham Act Section 43(a). Accordingly, Moving Defendants' Motion is GRANTED, and the Second Claim for Relief is DISMISSED, to the extent that it relies on the "false association"/false designation of origin subsection of Section 43(a) (15 U.S.C. § 1125(a)(1)(A)). However, Plaintiff has raised a triable issue of fact to the extent this Second Claim for Relief is based on the "false advertising" subsection (15 U.S.C. § 1125(a)(1)(B)). Therefore, the Motion is DENIED, and the Second Claim for Relief will remain in the case, as to this basis for recovery.

### 4. The Section 17200 Claim: the Third Claim for Relief

Having determined that Plaintiff's copyright claim (First Claim for Relief) does not survive, but that his Lanham Act claim (Second Claim for Relief) does, the Court now turns to the Third Claim for Relief under California Business and Professions Code Section 17200. The Unfair Business Practices Act prohibits any "unlawful, unfair, or fraudulent business practice." Cal. Bus. & Prof.Code § 17200. It also incorporates, both explicitly and by extension, claims premised on alleged falsities in a defendant's advertising materials. *See, e.g., Cairns v. Franklin Mint Company*, 24 F.Supp.2d 1013, 1037 (C.D.Cal.1998) ("Any violation of the false advertising law

necessarily violates the unfair competition law.") (citing *Freeman v. Time, Inc.*, 68 F.3d 285, 289 (9th Cir.1995) (internal citation omitted)). Thus, Plaintiff's Section 17200 claim is ostensibly based on, and therefore somewhat dependent on, his federal claims under the Copyright Act and Lanham Act. The parties agree that they rise and fall together.

As Plaintiff concedes, to the extent that Plaintiff seeks under this California statute to remedy alleged "misappropriation" of his protected expression fixed in the tangible medium of the Rice Video, his Section 17200 claim is preempted by the Copyright Act. *See, e.g., Kodadek v. MTV Networks, Inc.*, 152 F.3d 1209, 1212 (9th Cir.1998). Therefore, his Section 17200 claim not only cannot be based on any alleged violation of the Copyright Act (as that claim is dismissed), it cannot be based on the underlying conduct for that claim. Thus, Moving Defendants' Motion is GRANTED, and Plaintiff's Third Claim for Relief is DISMISSED, to the extent it relies on alleged copying or other misappropriation of the ideas or expression in the Rice Video.

However, Plaintiff may continue to state a Section 17200 claim under both the "unlawful" prong thereof (based on violation of Lanham Act Section 43(a)'s "false advertising" subsection) and the "false advertising" prong of Section 17200 itself, which requires only that "members of the public are likely to be deceived." *Freeman v. Time, Inc.*, 68 F.3d 285, 289 (9th Cir.1995) (citation and internal quotation marks omitted). Therefore, the Motion is DENIED, and the Third Claim for Relief survives, to the extent it is based on "false advertising."

### 5. The Eighth, Ninth, and Tenth Claims for Relief

Finally, the same reasoning would apparently apply to the state law "claims"/remedies alleged as the Eighth (for unjust enrichment), Ninth (for constructive trust), and Tenth (for an accounting) Claims for Relief. Moving Defendants' Motion is GRANTED, and these claims are DISMISSED, to the extent they rely on the copyright claim (or on the "false association" subsection of Section 43(a)). The Motion is DENIED to the extent these claims are based on "false advertising."

## V. CONCLUSION

For the foregoing reasons, the Court concludes that Plaintiff has failed to raise a triable issue of fact with regard to a substantial similarity between protectable elements in the Rice Video and in the Television Specials. Accordingly, the Court GRANTS Moving Defendants' Motion to the extent that it seeks summary adjudication of the First Claim for Relief, and DISMISSES this claim, with prejudice.

The Court also finds that Plaintiff has failed to raise a triable issue of fact insofar as his Second Claim for Relief arises under 15 U.S.C. § 1125(a)(1)(A), the "false association"/false designation of origin subsection of Section 43(a) of the Lanham Act. However, the Court finds that Plaintiff *has* raised a genuine issue for trial to the extent that this claim arises under the "false advertising" subsection thereof (15 U.S.C. § 1125(a)(1)(B)). Therefore, the Court GRANTS the Motion to the extent that it seeks dismissal of Plaintiff's claim of "false association"/false designation of origin, but DENIES it to the extent it seeks dismissal of the "false advertising" claim. In sum, this means that the Second Claim for Relief will remain, in part.

Finally, the Court GRANTS the Motion, and DISMISSES Plaintiff's Third, Eighth, Ninth, and Tenth Claims for Relief, to the extent that these claims are premised on alleged misappropriation of Plaintiff's ideas as expressed in the Rice Video. However, the Court DENIES the Motion

to the extent these claims are based on "false advertising."